STATE OF MARYLAND CENTRAL COLLECTION UNIT

v.

The BOARD OF REGENTS FOR EDUCATION OF the UNIVERSITY OF RHODE ISLAND.

No. 86–27–A.

Supreme Court of Rhode Island.

July 23, 1987.

John P. McCoy, Warwick, for plaintiff.

Nicholas Trott Long, Sheldon Whitehouse, Asst. Atty. Gen., for defendant.

## OPINION

WEISBERGER, Justice.

This case comes before us on appeal from an order entered in the Superior Court granting the defendant's motion to dismiss the plaintiff's suit to enforce a foreign judgment on the ground that the defendant was not subject to the jurisdiction of the out-of-state court. We reverse. The facts pertinent to the plaintiff's appeal are as follows.

On October 26, 1976, the University of Rhode Island (Rhode Island) and the University of Maryland (Maryland) entered into a contract, whereby Maryland agreed that its Center for Environmental and Estuarine Studies (CEES) would conduct a particular research project in collaboration with the Marine Ecosystems Research Laboratory (MERL) of Rhode Island's Graduate School of Oceanography. The contract described the project as a component of a broader program for which MERL had received a research grant of $1,000,000 from the Environmental Protection Agency (EPA). In consideration of the project, Rhode Island agreed to funnel a specified portion of the federal funds to Maryland, subject to the approval of and adjustment by the EPA.

Upon completion of the project, the universities engaged in a dispute regarding Rhode Island's performance of its obligation. Eventually, Maryland commenced a suit in a court of the state of Maryland and acquired a default judgment for damages in the amount of $10,017.21 plus court costs. As evidenced by a signed receipt,

Rhode Island had received notice of the suit by registered mail.

On July 16, 1985, Maryland commenced the instant suit to enforce the judgment. Rhode Island moved to dismiss, asserting that the judgment was a nullity on the ground that the Maryland court lacked subject matter and in personam jurisdiction. Specifically, Rhode Island argued that the underlying controversy was one between two states and as such fell within the exclusive jurisdiction of the Supreme Court of the United States. In addition, Rhode Island further argued that even if the Maryland court could properly assume jurisdiction over the underlying controversy, it could not assume in personam jurisdiction over Rhode Island under the due process standard of minimum contacts.

To support its contention that it did not have sufficient contacts with the state of Maryland to invoke the state's long-arm jurisdiction, Rhode Island submitted two affidavits of the associate director of MERL, Candace Oviatt, who described, from personal knowledge, the negotiation and performance of the contract. Noting that Maryland's representatives traveled to Rhode Island, Ms. Oviatt attested that the contract was negotiated entirely in the state of Rhode Island and was entered into by Rhode Island solely for the purpose of engaging the services of both Dr. Donald Heinle, a professor at Maryland, and Dr. Sandra Vargo, a postdoctoral student at Maryland. She noted that the greater part of the contract funds was designated for salaries and that Rhode Island directly paid Dr. Vargo and two Rhode Island graduate students assisting in the project. She further attested that the work contemplated in the contract was performed in the state of Rhode Island, including the collection of samples, the processing and computing of data, and the writing of professional papers, with the possible exception of certain writing by Dr. Heinle.

In opposing Rhode Island's motion, Maryland submitted an affidavit of the associate director of CEES, Paul Winn, who, on the basis of records kept in the ordinary course of business, presented additional facts relevant to the negotiation and performance of the contract. He noted that the contract was one of a series of five nearly identical contracts that the universities entered into over a five-year period spanning 1975 through 1979. He attested that Rhode Island prepared and offered all contracts. Specifically, the disputed contract was prepared by Rhode Island, sent to Maryland, and then amended, subscribed, and returned by Maryland to Rhode Island for its final execution. Mr. Winn further attested that Maryland performed the services outlined in the contract in the state of Maryland and that payment for those services was to be made in that state.

The contract itself delineates further the nature of Rhode Island's contacts with the state of Maryland. Describing not only the facilities of CEES but also, in particular, the skills of Drs. Heinle and Vargo as crucial to the research project, the contract prohibited Maryland from replacing the scientists without Rhode Island's prior approval. Indeed, the contract could be terminated and all equipment transferred if the scientists moved to another institution. Although Maryland was responsible for the implementation of the research, Rhode Island maintained scientific control, requiring quarterly progress reports from Maryland and reserving the right to review, on site, the progress of the project. To receive payment under the contract, Maryland was obligated to justify costs pursuant to EPA grant regulations and to submit monthly invoices to Rhode Island, documenting costs incurred during the previous month. All of Maryland's related financial records were subject to Rhode Island's audit. If events required, the contract allowed for the creation of a budget for Maryland personnel within Rhode Island's financial system. Finally, Rhode Island was to be assigned all rights, title, and interests in and to any "invention" arising from Maryland's performance of the contract, and for at least the duration of the contract, Rhode Island was to acquire and maintain title to all equipment purchased by Maryland for the implementation of the project.

The trial justice granted Rhode Island's motion to dismiss. Maryland's appeal therefrom presents this court with two questions of law: whether the nature of the underlying dispute is such that it must fall within the original and exclusive jurisdiction of the Supreme Court of the United States, and, if it does not, whether Rhode Island maintained sufficient contacts with the state of Maryland to warrant an exercise of that state's long-arm jurisdiction.

I

SUBJECT MATTER JURISDICTION

Article III, § 2, cl. 2, of the United States Constitution confers upon the Supreme Court original jurisdiction of all controversies between two or more states or affecting an envoy of a foreign nation. Although the constitutional grant of original jurisdiction is self-executing, and requires no legislative implementation, *California v. Arizona*, 440 U.S. 59, 65, 99 S. Ct. 919, 923, 59 L. Ed. 2d 144, 150 (1979), Congress has similarly provided in 28 U.S.C.A. § 1251(a) (1966) that the Supreme Court shall have original and exclusive jurisdiction over all controversies between two or more states and all proceedings against foreign ambassadors.

Conceding that the underlying controversy is one between two states and is therefore within the ambit of the Supreme Court's original jurisdiction, Maryland argues that in light of the nature of the relief requested and the availability of an alternative forum, the Court is not obligated, and in all likelihood would decline, to adjudicate its claim against Rhode Island.[1] We agree.

Although it may initially have been contemplated that the Supreme Court would faithfully exercise its original jurisdiction when properly called upon to do so, the Court, in recent years, has consistently construed its grant of original jurisdiction as conferring substantial discretion to make case-by-case judgments regarding the practical necessity of providing an original forum for all disputes within its jurisdictional reach. *Texas v. New Mexico*, 462 U.S. 554, 570, 103 S. Ct. 2558, 2568, 77 L. Ed. 2d 1, 16 (1983). That the Court would recognize a need to exert jurisdictional restraint was an inevitable consequence of its structure and role as an appellate forum.

Designed as an appellate tribunal, the Court has been from its inception ill-equipped for the fact-finding tasks demanded of a trial court. *Ohio v. Wyandotte Chemicals Corp.*, 401 U.S. 493, 498, 91 S. Ct. 1005, 1009, 28 L. Ed 2d 256, 262 (1971). In light of the Court's structural limitations, the very nature of interstate litigation calls for a cautious and discriminating exercise of original jurisdiction. Impressed that the need for restraint was apparent, Chief Justice Fuller wrote in 1900: "[original] jurisdiction is of so delicate and grave a character that it was not contemplated that it would be exercised save when the necessity was absolute * * * ." *Louisiana v. Texas*, 176 U.S. 1, 15, 20 S. Ct. 251, 256, 44 L. Ed. 347, 353 (1900).

Though the inherent difficulties of adjudicating original complaints, by themselves, call for jurisdictional restraint, the impact of these difficulties upon the Court's ability to attend to its appellate docket is, in the Court's eyes, a greater factor leading to a sparing exercise of original jurisdiction.

1. That the underlying contract dispute between the two state universities is ultimately a dispute between two states is clear. In *State of Arkansas v. State of Texas*, 346 U.S. 368, 370, 74 S. Ct. 109, 111, 98 L. Ed. 80, 82 (1953), the Supreme Court concluded that for purposes of exercising its original jurisdiction any injury to the University of Arkansas under a contract with a Texas charitable foundation would constitute an injury to the State of Arkansas. In determining that the university was an official state instrumentality, the Court referred to Arkansas law. A similar reference to the law of Maryland and to the law of Rhode Island establishes that the respective universities are unquestionably state agencies. *See Hanauer v. Elkins*, 217 Md. 213, 219, 141 A.2d 903, 906 (1958), *appeal dismissed*, 358 U.S. 643, 79 S. Ct. 536, 3 L. Ed. 2d 567 (1959) (University of Maryland is state agency); *Opinion to the Governor*, 94 R.I. 464, 468, 181 A.2d 618, 621 (1962) (University of Rhode Island is state agency); Md. Educ. Code Ann. § 13–101 (1985) (University of Maryland is body corporate and state agency); G.L. 1956 (1981 Reenactment) § 16–31–5 (Board of Regents of Education of University of Rhode Island is public corporation).

*Wyandotte Chemicals Corp.*, 401 U.S. at 498, 91 S. Ct. at 1009, 28 L. Ed. 2d at 262. As the interpretation of federal law grew more complex within the context of modern society, the Court's role as the final forum for constitutional and federal question appeals expanded and assumed paramount importance. This expansion coupled with the time demands of original suits exposed the limits of the Court's resources and prompted an examination of the values and assumptions underlying the administration of the Court's varying responsibilities. Concerned that a broad exercise of its original jurisdiction would unjustifiably monopolize its attention, the Court found the common law tradition compelling courts to exercise fully their jurisdictional reach untenable and sought to use its discretion as a method of preserving its resources for the performance of its primary responsibilities as the supreme federal appellate court. *Wyandotte Chemicals Corp.*, 401 U.S. at 497–99, 91 S. Ct. at 1009–10, 28 L. Ed. 2d at 262–63.[2]

In *Illinois v. City of Milwaukee*, 406 U.S. 91, 93, 92 S. Ct. 1385, 1388, 31 L. Ed. 2d 712, 718 (1972), the Court defined the bounds of its discretion and established a concrete standard for assuming original jurisdiction of interstate disputes:

"We construe 28 U.S.C. § 1251(a)(1), as we do Art. III, § 2, cl. 2, to honor our original jurisdiction but to make it obligatory only in appropriate cases. And the question of what is appropriate concerns, of course, the seriousness and dignity of the claim; yet beyond that it necessarily involves the availability of another forum where there is jurisdiction over the named parties, where the issues tendered may be litigated, and where appropriate relief may be had."

In applying the first prong of this standard, the Court has suggested that the underlying controversy, to rise to the requisite level of seriousness and dignity, should present a vital question of national significance or implicate essential concerns of federalism. *See Maryland v. Louisiana*, 451 U.S. 725, 743–44, 101 S. Ct. 2114, 2127, 68 L. Ed. 2d 576, 594 (1981); *Washington v. General Motors Corp.*, 406 U.S. 109, 112, 92 S. Ct. 1396, 1397, 31 L. Ed. 2d 727, 730 (1972). To emphasize that the alleged injury should be of a substantial magnitude, the Court has gone so far as to state that the model case warranting an exercise of its original jurisdiction is a dispute between states of such seriousness that it would amount to casus belli if the states were fully sovereign. *Texas v. New Mexico*, 462 U.S. at 571 n.18, 103 S. Ct. at 2569 n.18, 77 L. Ed. 2d at 16 n.18. Accordingly, actions between two or more states that are of sufficient gravity to justify the Court's exercise of original jurisdiction typically involve boundary disputes, *see, e.g., Ohio v. Kentucky*, 410 U.S. 641, 93 S. Ct. 1178, 35 L. Ed. 2d 560 (1973), questions of title to land, *see, e.g., California v. Arizona*, 440 U.S. 59, 99 S. Ct. 919, 59 L. Ed. 2d 144 (1979), enforcement of rights under interstate compacts, *see, e.g., Texas v. New Mexico*, 462 U.S. 554, 103 S. Ct. 2558, 77 L. Ed. 2d 1 (1983), and constitutional challenges to state taxation of interstate commerce, *see, e.g., Maryland v. Louisiana*, 451 U.S. 725, 101 S. Ct. 2114, 68 L. Ed. 2d 576 (1981). The nature of these cases leads us to conclude that in most instances minor contractual disputes between state agencies would fail to raise a vital question of national significance or essential concerns of federalism within the meaning of the Court's discretionary test.[3]

**2.** For a brief historical survey of the Court's mounting workload and its effect upon the Court's practice see Stern, Gressman & Shapiro, *Supreme Court Practice* 27–39 (6th ed. 1986). To place the Court's discretionary and sparing exercise of original jurisdiction within a perspective of its total workload, we note that during the 1984 term, of the 4269 cases disposed of, only eight were on the original docket. *The Supreme Court, 1984 Term—Leading Cases*, 99 Harv. L. Rev. 120, 326 (1985).

**3.** We note, without affording precedential weight, that the Court has in the past denied one state leave to file an original action against another state for breach of contract to play a football game between universities of two states. *California v. West Virginia*, 454 U.S. 1027, 102 S. Ct. 561, 70 L. Ed. 2d 470 (1981). Rhode Island, however, apparently relies on *Arkansas v. Texas*, 346 U.S. 368, 74 S. Ct. 109, 98 L. Ed. 80 (1953), for its argument that the Court must, to the exclusion of state courts, hear the instant

The second prong of the Court's jurisdictional standard indicates that the Court has found it entirely appropriate to consider the availability of an alternative forum, even though Congress has designated the Court's original jurisdiction over interstate disputes as exclusive. It is true that if read literally, 28 U.S.C.A. § 1251(a)(1), unlike Art. III, § 2, cl. 2 uses the word exclusive and thus would seem to impose upon the Court an obligation to hear and decide all disputes between two or more states even though alternative forums are available. But because of its escalating workload the Court reads § 1251(a)(1), as it does Article III, to bestow discretion to hear only appropriate cases, namely, those that present a clear case or controversy between states, *see Massachusetts v. Missouri*, 308 U.S. 1, 15, 60 S. Ct. 39, 42, 84 L. Ed. 3, 8 (1939), and those that survive the equitable and prudential limitations described in *Illinois v. City of Milwaukee.* That the Court has the power to construe and act upon this discretion is clear. Congress has no power to add or detract from the jurisdictional grant by Article III of the United States Constitution. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). In this context, the Court has chosen to dilute the purported exclusive statutory jurisdiction by placing a discretionary gloss upon that term. Thus, absent vital questions of national significance and essential concerns of federalism, the Court apparently presumes that state courts, otherwise possessed of jurisdiction, are capable of rising above considerations of parochialism to adjudicate impartially certain interstate disputes. *Compare Arizona v. New Mexico*, 425 U.S. 794, 797, 96 S. Ct. 1845, 1847, 48 L. Ed. 2d 376, 380 (1976) (state court appropriate forum for issue of limited national impact) *with Maryland v. Louisiana*, 451 U.S. at 743–44, 101 S. Ct. at 2127, 68 L. Ed. 2d at 594 (Supreme Court appropriate forum for issue of broad national impact).

■ In light of the foregoing, we are of the opinion that the Court would most certainly decline to assume original jurisdiction of Maryland's claim against Rhode Island. The claim arises from a simple contractual dispute, easily and more appropriately resolved through the familiar fact-finding process of trial. The nature of the claim raises no vital question of national significance. Nor does it represent an encroachment upon either of the states' rights of such magnitude as to violate fundamental principles of federalism. Aside from the contention that the Supreme Court must, to the exclusion of lower courts, assert jurisdiction over this interstate dispute, Rhode Island presents us with no statutory or judicial bar prohibiting the Maryland court from hearing the subject matter of this dispute. Rhode Island's contention that the Court must assert jurisdiction misconceives the Court's constitutional power and current philosophy to exercise sparingly its original jurisdiction, and ignores the equitable and prudential limitations imposed by the Court to identify

contractual dispute. As explained in note 1, that case stands for the proposition that the Court will consider a state university, if clearly a state agency under state law, a state for the purposes of exercising its original jurisdiction.

In that case, Texas filed suit in a Texas court to enjoin a Texas charitable foundation from performing a contract whereby it had agreed to contribute a sum of $500,000 to the construction of a pediatric unit in a new hospital in Arkansas State Medical Center. The suit was filed on the ground that under Texas law the trust funds of the foundation must be expended for the benefit of Texas residents. Arkansas filed a complaint to invoke the Court's original jurisdiction, requesting that Texas be enjoined from further interference with the contract. Although finding that the university was a state agency and that the suit did represent a controversy between two states, the Court did not turn to the merits of the case. Rather, the Court found that since the underlying issue was a question of state law that the pending state litigation would resolve, the motion to invoke the Court's jurisdiction should be continued until the state litigation was concluded. Specifically the Court stated: "If that litigation resolves the whole controversy, leaving no federal questions, there will be no occasion for us to proceed further." Id. at 371, 74 S. Ct. at 111, 98 L. Ed. at 83. Clearly the case does not support Rhode Island's contention, but instead demonstrates that if an alternative forum is available the Court will, absent questions of federalism, decline to exercise its original jurisdiction.

those interstate disputes that are appropriate for its attention. Thus, assuming a proper exercise of long-arm in personam jurisdiction, the Maryland court provides a viable, indeed more practicable in light of its fact-finding capacities, alternative forum.

In sum, we find that it is beyond even the remotest possibility that the Supreme Court—burdened as it is with a nearly unmanageable case load embodying in many instances piercing constitutional questions—would find a practical necessity to exercise its original jurisdiction over this $10,000 contract dispute, when a state tribunal is available and better equipped to provide the parties with relief.

## II

### IN PERSONAM JURISDICTION

The Maryland long-arm statute authorizes the extension of in personam jurisdiction over a nonresident defendant who engages in any one of six enumerated activities, provided the cause of action arises from that activity. *See* Md. Cts. & Jud. Proc. Code Ann. § 6–103 (1984). Traditional long-arm analysis teaches that the propriety of extending jurisdiction under a statute such as Maryland's turns upon a twofold inquiry: whether the activities of the nonresident defendant fall within the scope of the statute, and, if so, whether the statute, so construed, is consistent with due process. Maryland argues that Rhode Island's acts in relation to the contract fall within the statute and that the consequential extension of jurisdiction comports with due process. We agree.

Among the activities purporting to extend jurisdiction under the Maryland statute is that of transacting business within the state. *See* § 6–103(b)(1). The Maryland Court of Appeals has interpreted this provision to encompass not only an act of commerce or a transaction for profit but any endeavor involving purposeful activities within state as well. *See Mohamed v. Michael*, 279 Md. 653, 658, 370 A.2d 551, 554 (1977); *Novack v. National Hot Rod Ass'n*, 247 Md. 350, 356, 231 A.2d 22, 26

(1967). This court has previously considered the scope of the Maryland statute and found that the activities of a nonresident in relation to a contract for services within the state of Maryland would fall, for analytical purposes, within the statutory category of transacting business, even though the contract resulted in no monetary gain to the nonresident. *See Trustees of the Sheppard and Enoch Pratt Hospital v. Smith*, 114 R.I. 181, 186, 330 A.2d 804, 806–07 (1975). Similarly, we now find that Rhode Island's activities in relation to the instant contract are within the contemplation of the transacting-business provision and, if sufficient, would trigger an extension of jurisdiction under that provision.

With respect to the question of sufficiency, the Maryland Court of Appeals has read into the provision a legislative intent to expand jurisdiction to the outer bounds of constitutional limits, and has accordingly ruled that, to trigger the provision, a nonresident's instate business transactions need only rise to the minimum level demanded by due process. *See Mohamed v. Michael*, 279 Md. at 657, 370 A.2d at 553–54; *Harris v. Arlen Properties, Inc.*, 256 Md. 185, 195–96, 260 A.2d 22, 27–28 (1969). We turn therefore to the limitations imposed by due process upon the scope of the Maryland statute.

■ Under the due process clause of the Fourteenth Amendment, a nonresident defendant possesses a liberty interest in not being subject to unfair and unreasonable assertions of in personam jurisdiction by foreign states. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72, 105 S. Ct. 2174, 2181–82, 85 L. Ed. 2d 528, 540 (1985). Historically, the Supreme Court construed this interest to require a narrow theory of jurisdiction based upon territorial presence. *See Pennoyer v. Neff*, 95 U.S. (5 Otto) 714, 722, 24 L. Ed. 565, 568 (1878). But as modern technology eased the burdens of interstate communication and promoted a national system of commerce, jurisdictional concepts of fairness and reasonableness changed and expanded the strictures of due process. In *International Shoe Co. v.*

*Washington,* 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945), the Court announced the now familiar standard for asserting in personam jurisdiction over a nonresident defendant:

"[D]ue process requires only that in order to subject a defendant to a judgment *in personam,* if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" 326 U.S. at 316, 66 S. Ct. at 158, 90 L. Ed. at 102 (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S. Ct. 339, 343, 85 L. Ed. 278, 283 (1940)).

If the standard is familiar, so too are the key principles guiding its application. In measuring minimum contacts, a court must not look to the unilateral activity of those within the forum state who claim some relationship with the nonresident defendant. *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S. Ct. 1228, 1239–40, 2 L. Ed. 2d 1283, 1298 (1958). Rather, a court must focus on the relationship among the defendant, the forum, and the litigation. *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S. Ct. 2569, 2580, 53 L. Ed. 2d 683, 698 (1977). It is essential that this focus reveal "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson,* 357 U.S. at 253, 78 S. Ct. at 1240, 2 L. Ed. 2d at 1298. The nature of the act and the magnitude of its connection with the forum state must be such that the defendant should reasonably anticipate being haled into court in that state. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S. Ct. 559, 567, 62 L. Ed. 2d 490, 501 (1980). Under these principles, a single act can support long-arm jurisdiction as long as it does not represent a random or fortuitous event, and as long as it creates a connection with the forum substantial enough to give rise to the reasonable foreseeability of litigation within the forum. *Burger King Corp.,* 471 U.S. at 475–76 n.18, 105 S. Ct. at 2184 n.18, 85 L. Ed. 2d at 543 n.18; *McGee v. International Life Insurance Co.,* 355 U.S. 220, 223,

78 S. Ct. 199, 201, 2 L. Ed. 2d 223, 226 (1957). Finally, once a court determines that a nonresident defendant purposefully established minimum contacts with the foreign forum, the court must consider whether the exercise of jurisdiction would offend fair play and substantial justice. This determination turns upon a number of factors, including the burden upon the defendant, the interests of the forum state, the plaintiff's interest in obtaining relief, the interstate judicial system's interest in efficiently resolving disputes, and finally the shared interest of the several states in furthering fundamental · social policies. *Burger King Corp.,* 471 U.S. at 476–77, 105 S. Ct. at 2184, 85 L. Ed. 2d at 543. Although these factors may establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required, they must be compelling if they are to defeat jurisdiction over a defendant with purposeful and clear contacts. *Id.* at 477, 105 S. Ct. at 2184–85, 85 L. Ed. 2d at 543–44.

Early in the evolution of these principles, the Court addressed the application of the minimum-contacts standard to interstate contractual obligations and held that a defendant who reaches out beyond one state and creates continuing relationships and obligations with citizens of another state is amenable to suit in the foreign state. *Travelers Health Association v. Virginia,* 339 U.S. 643, 647, 70 S. Ct. 927, 929, 94 L. Ed. 1154, 1161 (1950). As the minimum-contact standard evolved and the proposition that a single act could support long-arm jurisdiction was announced, questions arose concerning whether and to what extent merely entering into a contract, without evidence of other contacts, could sustain the extension of long-arm jurisdiction. Just recently, the Court responded that it could not. *Burger King Corp.,* 471 U.S. at 478, 105 S. Ct. at 2185, 85 L. Ed. 2d at 545. Reasoning that a contract is but an intermediate step connecting prior negotiations with future objectives, the Court held that beyond the mere act of entering into a contract, other factors such as prior negotiations, anticipated consequences, course of

dealings, as well as the actual terms of the contract must indicate that the nonresident defendant purposefully established minimum contacts with the forum. *Id.* at 479, 105 S. Ct. at 2186, 85 L. Ed. 2d at 545.

We find that the instant dispute grows out of a contract that has a substantial connection with the state of Maryland. We are of the opinion that Rhode Island reached out beyond our state and created a continuing relationship with and obligations to Maryland and in so doing deliberately engaged in significant activities within the state of Maryland such that it purposefully availed itself of the privilege of conducting business in the state and should have therefore reasonably anticipated being haled into court there. Because Rhode Island's activities were shielded by the benefits and protections of the laws of the state of Maryland, it is not unfair nor unreasonable to require Rhode Island to submit to the burdens of litigation in that state.

As is clear from Rhode Island's affidavits and the contract itself, Rhode Island's sole motivation for entering into the contract was to acquire the benefits of specific services the facilities and, in particular, the staff of CEES could provide. Clearly, Rhode Island's activities in the state of Maryland were not random or fortuitous. In fact, its activities reflect a continuous and systematic pattern of negotiations with Maryland for services over the course of five years. That different aspects of those negotiations, and even elements of the contractual process, occurred in one or the other state at varying times over the years does not, in our opinion, significantly diminish Rhode Island's contacts with the state of Maryland such that due process would be offended at the assertion of jurisdiction, especially in light of the substantial control the contract gave Rhode Island over Maryland's performance. Physical presence in the forum state at the elusive moment of the "meeting of the minds," while clearly indicative of minimum contacts, is not required, if other activities can provide the necessary connection between the defendant, the forum, and

the litigation. Indeed, it is "an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." *Burger King Corp.*, 471 U.S. at 476, 105 S. Ct. at 2184, 85 L. Ed. 2d at 543; *see Ben's Marine Sales v. Sleek Craft Boats*, 502 A.2d 808, 815 (R.I. 1985) (minimum contacts relative to contract found though contract made outside of forum state). Thus, we find the place of the contract's execution and the travels of the parties during precontract negotiations not as significant as Rhode Island's purposeful activities to acquire the services of Maryland, which by the terms of the contract were to be performed in the state of Maryland. Moreover, Rhode Island's substantial control and supervision of Maryland's performance of the research project, which by the terms of the contract included such activities as mandatory progress reports, on-site project reviews, open audits, acquisition of title to new equipment, and potential assignment of rights to "inventions" resulting from the contract's performance were significant and purposeful activities within that state.

Having found that Rhode Island purposefully established minimum contacts with the state of Maryland, we considered but found no factor of inconvenience weighing against the state's exercise of jurisdiction, and thus are of the opinion that such exercise would not offend fair play and substantial justice. In sum, by purposefully contracting for the benefits of services performed in the state of Maryland and by continually supervising the performance of those services, Rhode Island transacted business in the state, as contemplated by the Maryland long-arm statute, to a sufficient degree to satisfy due process, and thereby trigger the statute's extension of in personam jurisdiction.

Under the full faith and credit clause, a state court must enforce and give effect to a judgment of a court of a sister state, provided, upon inquiry, the court is satisfied that its sister court properly exer-

cised subject-matter and in personam jurisdiction. *Underwriters National Assurance Co. v. North Carolina Life and Accident and Health Insurance Guaranty Association*, 455 U.S. 691, 704–05, 102 S. Ct. 1357, 1366, 71 L. Ed. 2d 558, 570–71 (1982). We have found that a court of the state of Maryland properly assumed jurisdiction of this interstate dispute and properly exercised in personam jurisdiction over Rhode Island.

For the foregoing reasons, the plaintiff's appeal is sustained. The judgment of dismissal is vacated and the papers in this case are remanded to the Superior Court for further proceedings in accordance with this opinion.