August 26, 1993 UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1034

UNIVERSITY OF RHODE ISLAND,

Plaintiff, Appellant,

v.

A. W. CHESTERTON COMPANY,

Defendant, Appellee.

ERRATA SHEET

The opinion of this Court issued on August 16, 1993, is
amended as follows:

Page 8, line 5, should read: as the nominal plaintiff
. . .

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1034

UNIVERSITY OF RHODE ISLAND,

Plaintiff, Appellant,

v.

A. W. CHESTERTON COMPANY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ronald R. Lagueux, U.S. District Judge]

Before

Cyr and Boudin, Circuit Judges,

and Hornby,* District Judge.

Louis J. Saccoccio with whom Merlyn P. O'Keefe and Packer &

O'Keefe were on brief for appellant.

Steven E. Snow with whom Partridge, Snow & Hahn was on brief for

appellee.

August 16, 1993

*Of the District of Maine, sitting by designation

CYR, Circuit Judge. The University of Rhode Island
CYR, Circuit Judge.

("URI") appeals a judgment disallowing its breach of warranty

claims against A.W. Chesterton Company ("Chesterton"), contending

that the district court lacked subject matter jurisdiction, and

challenging various rulings at trial. Finding no error, we

affirm.

I

BACKGROUND

We recite only those record facts essential to an

understanding of the issues raised on appeal, drawing all reason-

able inferences in favor of plaintiff-appellant URI. Richmond

Steel, Inc. v. Puerto Rican American Ins. Co., 954 F.2d 19, 20

(1st Cir. 1992). The R/V Endeavor is a vessel chartered by the

National Science Foundation to URI's Graduate School of Oceanog-

raphy (GSO) for research purposes. In the summer of 1985, John

Metz, the GSO's port engineer, discovered serious rust corrosion

on the inside of the Endeavor's steel ballast tanks, which are

submerged in salt water during normal operation of the vessel.

Responding to a Chesterton advertisement, Metz received test

samples of "Rust Transformer," a Chesterton product which pur-

portedly converts surface corrosion into a rust-inhibitor, which

in turn serves as a base for further coats of paint. Satisfied

with the test-sample results, Metz invited Chesterton sales

representatives aboard the Endeavor. After inspecting the

2

Endeavor's ballast tank corrosion, Chesterton's representatives

recommended that Metz use Chesterton's 1-2-3 System (using Rust

Transformer, a primer, and a final enamel coat) to rehabilitate

the tanks. Metz ordered the 1-2-3 System on September 11,

1985.1 Six months after URI completed the 1-2-3 System applica-

tion, the new coating on the ballast tanks began to loosen and

flake off. URI allegedly expended $100,000 to correct the

problem.

URI brought suit against Chesterton in Rhode Island

state court on May 4, 1989, alleging negligence, strict

liability, and breaches of an express warranty and implied

warranties of merchantability and fitness for a particular

purpose. Chesterton promptly removed the action to federal

district court. URI moved for remand on the ground that URI, as

an "alter ego, arm, or agent" of the State of Rhode Island, is

not a "citizen" of Rhode Island for diversity purposes. The

district court denied URI's remand motion without an evidentiary

hearing, relying on an earlier district court decision, see

Vanlaarhoven v. Newman, 564 F. Supp. 145 (D.R.I. 1983) (Selya,

J.), which determined that URI was not an "arm" of the State for

sovereign immunity purposes.

1The original URI complaint alleged that Metz was reassured
by Chesterton that the 1-2-3 System would work on Endeavor's
ballast tanks. On the other hand, the product's written instruc-
tions advised that the system was not recommended for surfaces
regularly immersed in sea water. In an amended complaint, URI
alleged that Chesterton representatives observed the URI crew
applying the 1-2-3 System to the ballast tanks, but said nothing
to URI representatives about the unsuitability of the system or
its improper application.

3

This court declined to entertain URI's interlocutory

appeal from the jurisdictional ruling but noted disagreement

among the circuits as to the proper criteria for determining the

citizenship of state universities for diversity purposes. We

recommended that the district court conduct "limited factfinding"

on remand relating to several factors pertinent to URI's citizen-

ship, including (1) "the degree of URI's dependence on and

functional integration with the state treasury," (2) "the per-

centage of URI's annual budget that derives from state appropria-

tions," and (3) "whether the legislature bases levels of such

appropriations in part on the amount of nonappropriated funds

available to URI."2 On remand, the district court denied URI's

motion for a pretrial evidentiary hearing relating to these

jurisdictional matters. The jury trial began on December 3,

1991. After the district court excluded the testimony of URI's

only expert witness on the issue of contract damages, URI abrupt-

ly rested its case. Judgment was entered for Chesterton on all

counts, as a matter of law, pursuant to Fed. R. Civ. P. 50(a),

and URI appealed.

II

DISCUSSION

2As an alternate and independent reason for declining to
entertain the interlocutory appeal, this court noted that the
litigation was unlikely to be so protracted as to warrant appel-
late interruption, given the nature and scope of URI's contract
claims.

4

A. Subject Matter Jurisdiction

URI urges us to set aside the judgment and remand the

case to state court on the ground that Chesterton, a Massachu-

setts corporation, has not established diversity. URI contends

that it is not a Rhode Island "citizen," but a mere "arm" or

"alter ego" of the State. See Gibbs v. Buck, 307 U.S. 66, 69

(1939) (holding that party invoking diversity jurisdiction must

establish sufficient facts to warrant its exercise); Bank One,

Texas, N.A. v. Montle, 964 F.2d 48, 50 (1st Cir. 1992) (same);

see also Shamrock Oil Corp. & Gas Co. v. Sheets, 313 U.S. 100,

108-09 (1941) (removal statute should be strictly construed

against removal); McNutt v. General Motors Acceptance Corp., 298

U.S. 178, 187 (1936); Wilson v. Republic Iron & Steel Co., 257

U.S. 92, 97 (1921).

We begin with first principles. A State cannot be a

"citizen" of itself for purposes of diversity jurisdiction.3

Moor v. County of Alameda, 411 U.S. 693, 717 (1973); Postal Tel.

Cable Co. v. Alabama, 155 U.S. 482, 487 (1894). On the other

hand, a political subdivision possessing the formal status of a

"body politic and corporate," such as a county or municipality,

is presumed a "citizen" for diversity purposes "unless it is

simply 'the arm or alter ego of the State.'" Moor, 411 U.S. at

717, 721 (finding that Alameda County had a "sufficiently inde-

3Section 1332(a) provides that "[t]he district courts shall
have original jurisdiction of all civil actions . . . [involving
over $50,000] . . . between . . . citizens of different States
. . . ." 28 U.S.C. 1332(a)(1).

5

pendent corporate character" to be a "citizen" of California for

diversity purposes) (citation omitted) (emphasis in original);

Illinois v. City of Milwaukee, 406 U.S. 91, 97 (1972); Cowles v.

Mercer County, 74 U.S. (7 Wall.) 118, 121-22 (1869).4 Thus, in

4A political subdivision's "detachment" from the State
generally will deprive it of the right to partake of the State's
sovereign immunity under the Eleventh Amendment. See U.S. Const.

amend. XI ("The judicial power of the United States shall not be
construed to extend to any suit in law or equity, commenced or
prosecuted against one of the United States by citizens of
another state . . . ."). Although we have noted the essential
similarity between the immunity and diversity tests, see George

R. Whitten, Jr. Inc. v. State Univ. Constr. Fund, 493 F.2d 177,

179 n.2 (1st Cir. 1974) (tests "closely allied and yet not
identical"); cf. Krieger v. Trane Co., 765 F. Supp. 756, 758 (D.

D.C. 1991) (rejecting any distinction between the two tests), we
have not had occasion to identify the precise nature of any
differences. In this case, however, we address, and reject, two
proposed distinctions. First, Eleventh Amendment analysis
normally would focus primary attention on any financial drain on

the State treasury caused by a judgment adverse to URI, see Quern

v. Jordan, 440 U.S. 332, 337 (1979); Edelman v. Jordan, 415 U.S.

651, 663 (1974), a concern which obviously does not arise in a
diversity case where the State-related plaintiff seeks to recover

a monetary judgment. Significantly, however, courts have not
accepted the notion that sovereign immunity exists only if the

State treasury is threatened. See Cory v. White, 457 U.S. 85,

90-91 (1982); Kroll v. Board of Trustees of Univ. of Illinois,

934 F.2d 904, 908 (7th Cir.), cert. denied, 112 S. Ct. 377

(1991); Harden v. Adams, 760 F.2d 1158, 1163 (11th Cir.) (Troy

State University), cert. denied, 474 U.S. 1007 (1985). Whether

in the diversity or the immunity context, the analysis must
center on the State-related party's enduring legal identity as a
juridical entity separate from the State.
The second possible distinction we must consider is that,
unlike sovereign immunity, nondiversity cannot be waived by the
State. See State Highway Comm'n of Wyoming v. Utah Constr. Co.,

278 U.S. 194, 199 (1929); George R. Whitten, Jr., Inc., 493 F.2d

at 179. Generally, however, the "waiver of immunity" inquiry
would follow the initial determination that the State-related

entity was not sufficiently autonomous to escape characterization
as an "alter ego" of the State. For example, in Vanlaarhoven,

the court based its holding on the alternate ground that, even
if URI were merely an "alter ego" of the State, the State had
expressly waived URI's immunity under state law by granting it
the authority to "sue or be sued" in its own name. Vanlaarhoven,

564 F. Supp. at 149; see also infra note 7. While such a bypass

6

principle at least, public and private corporations are accorded

similar treatment as "citizens" for diversity purposes. See 28

U.S.C. 1332(c)(1) ("For purposes of this section . . . a

corporation shall be deemed to be a citizen of any State by which

it has been incorporated . . . ."); see also Media Duplication

Servs., Ltd. v. HDG Software, Inc., 928 F.2d 1228, 1236 (1st Cir.

1991).

The Rhode Island Board of Higher Education ("Board") is

nominally constituted by the State of Rhode Island as the legal

entity which acts in behalf of URI and other public postsecondary

educational institutions in Rhode Island.5 The Board has been

constituted a "public corporation," R.I. Gen. Laws 16-59-1,6

see infra note 10, just as the County of Alameda is a "body

argument is impermissible where the sole issue is URI's citizen-
ship for diversity purposes, sovereign immunity case law, and its
identification of the relevant attributes of autonomy, is no less
probative in diversity cases; hence, we cite to these cases as
apposite.

5The complaint mistakenly designates URI as the plaintiff.
Since URI is not a distinct legal entity under Rhode Island law,
we treat the Board as the real party in interest, as did the
district court.

6Section 16-59-1(a) provides, in pertinent part: "There is
hereby created a board of governors for higher education, some-
times hereinafter referred to as the 'board' or the 'board of
governors,' which shall be and hereby is constituted a public
corporation, empowered to sue and be sued in its own name, to
have a corporate seal, and to exercise all the powers, in addi-
tion to those hereinafter specifically enumerated, usually
appertaining to public corporations entrusted with control of
postsecondary educational institutions and functions." R.I. Gen.
Laws 16-59-1(a) (1992). In all significant respects, this
section, enacted in 1988, merely extended the extant powers
possessed by the Board's immediate predecessor, the entity
involved in Vanlaarhoven.

7

corporate and politic" under California law. Moor, 411 U.S. at

719 (citing Cal. Gov't Code 23003).

Several ancillary principles derive from Moor. The

criteria are substantially similar for evaluating whether an

entity is a citizen of the State for diversity purposes, or a

State for Eleventh Amendment sovereign immunity purposes, see

Northeast Fed. Credit Union v. Neves, 837 F.2d 531, 534 (1st Cir.

1988) (tests "pretty much the same"); see supra note 4, and

present the same ultimate question for decision: whether the

State of Rhode Island remains the real party in interest, not-

withstanding URI's designation as the nominal plaintiff. See id.

at 533 ("For the purpose of diversity jurisdiction, the determi-

native factor is whether the state is the real party in inter-

est.") (quoting Krisel v. Duran, 386 F.2d 179, 181 (2d Cir.),

cert. denied, 390 U.S. 1042 (1967)); see also Kovats v. Rutgers,

822 F.2d 1303, 1307 (3d Cir. 1987) (immunity), cert. denied, 489

U.S. 1014 (1987); Ronwin v. Shapiro, 657 F.2d 1071, 1073 (9th

Cir. 1981) (Board of Regents of Arizona) (immunity and diversi-

ty); Jagnandan v. Giles, 538 F.2d 1166, 1173 (5th Cir. 1976)

(Mississippi State University) (immunity), cert. denied, 432 U.S.

910 (1977); Krieger v. Trane Co., 765 F. Supp. 756, 757-58

(D.D.C. 1991) (diversity). Thus, most unincorporated state

agencies and departments are readily recognizable as mere "arms"

or "alter egos" of the State.

On the other hand, though the State's formal incorpora-

tion of a State-related entity is not necessarily dispositive on

8

the issue of its autonomy, either for immunity or diversity

purposes, see, e.g., Jagnandan, 538 F.2d at 1174, 1176; Krieger,

765 F. Supp. at 760, 762, the legislative act of incorporation

should prompt a thorough examination into the precise nature of

the entity established under state law. See Moor, 411 U.S. at

719 (undertaking "a detailed examination of the relevant provi-

sions of California law" in order to rule out Alameda County's

"mere agency"); id. at 721 n.54 (generally repudiating resort to

"conclusory" determinations as to entity's legal character); see

also Lake Country Estates, Inc. v. Tahoe Regional Planning

Agency, 440 U.S. 391, 401 (1979); Mt. Healthy City Sch. Dist. Bd.

of Educ. v. Doyle, 429 U.S. 274, 280 (1977); Kovats, 822 F.2d at

1307; Goss v. San Jacinto Junior College, 588 F.2d 96, 98 (5th

Cir. 1979). Accordingly, comparing the incorporated public

entity to the polar extremes (the State on the one hand, and

political subdivisions on the other), we must determine whether

the nominal public corporation possesses "a sufficiently indepen-

dent corporate character to dictate that it be treated as a

citizen of [the State of incorporation]." Moor, 411 U.S. at 721.

See Mt. Healthy, 429 U.S. at 280 (finding city board "more like a

county or city than it is like an arm of the State") (emphasis

added); see also Kashani v. Purdue Univ., 813 F.2d 843, 845 (7th

Cir. 1987), cert. denied, 484 U.S. 846 (1988); Goss, 588 F.2d at

98.

Often these comparative appraisals unavoidably lead to

imprecise distinctions in degree, rarely amenable to ready

9

resolution. Cf. Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct &

Sewer Auth., F.2d , (1st Cir. 1993) [No. 91-1602, 1993

U.S. App. LEXIS 10064, at 10 (1st Cir. May 3, 1993)] (noting that

agency's entitlement to immunity "poses an essentially functional

inquiry, not easily amenable to bright-line answers or mechanical

solutions") (emphasis added). Like their private counterparts,

public corporations are hardly monolithic, having been vested

with whatever powers, rights, and privileges state legislatures

may bestow to suit the public purpose for which the particular

corporation was commissioned. Although the vast majority of state

universities, incorporated and unincorporated alike, have been

found to be "arms" of the State for immunity and diversity

purposes, each state university must be evaluated in light of its

unique characteristics. See Kovats, 822 F.2d at 1303; Kashani,

813 F.2d at 845; Hall v. Medical College of Ohio, 742 F.2d 299,

302 (6th Cir. 1984), cert. denied, 469 U.S. 1113 (1985); United

Carolina Bank v. Board of Regents, 665 F.2d 553, 557 (5th Cir.

1982) (Austin State University); Soni v. Board of Trustees of

Univ. of Tennessee, 513 F.2d 347, 352 (6th Cir. 1975), cert.

denied, 426 U.S. 919 (1976); University Sys. of New Hampshire v.

United States Gypsum, 756 F. Supp. 640, 645 (D.N.H. 1991).7

7Even if it were presumed that the immunity and diversity
standards converge, see supra note 4, Vanlaarhoven was not

conclusive as to URI's citizenship for diversity purposes.
Chesterton argues that URI is barred, by Vanlaarhoven and col-

lateral estoppel, from litigating the diversity jurisdiction
issue. We do not agree. Chesterton did not raise the estoppel
issue in the district court, nor did the court invoke collateral
estoppel by way of reference to Vanlaarhoven. Thus, Chesterton

waived the issue. McCoy v. Massachusetts Inst. of Technology,

10

We have propounded an illustrative list of criteria

by no means exhaustive often germane to the Eleventh Amendment

"arm" or "alter ego" determination, including whether the entity

(1) performs an "essential" or "traditional" governmental func-

tion, as opposed to a nonessential or merely proprietary one; (2)

exercises substantial autonomy over its internal operations; (3)

950 F.2d 13, 22 (1st Cir. 1991), cert. denied, 112 S. Ct. 1939

(1992) (issues not "squarely" raised before trial court cannot be
raised on appeal). Moreover, the "alter ego" determination in
Vanlaarhoven was not "essential" to the judgment, in at least two

respects. See Restatement (Second) of Judgments 27 ("When an

issue of fact or law is actually litigated by a valid and final
judgment, and the determination is essential to the judgment, the

determination is conclusive . . . .") (emphasis added). First,
the Vanlaarhoven court, as an alternate holding, assumed arguendo

that URI might be an "alter ego" of the State, but went on to
hold that Rhode Island law had recognized similar grants of the
power to sue and be sued as express waivers by the State of an
alter ego's sovereign immunity from unconsented suit. Vanlaar-

hoven, 564 F. Supp. at 149; see supra note 4. Second, URI, the

defendant in Vanlaarhoven, prevailed on the merits. Except in

limited circumstances not present here, the party that prevails
on the merits is not obligated to appeal from an adverse ruling

on a collateral issue. Cf. Deposit Guar. Nat'l Bank v. Roper,

445 U.S. 326, 334-35 (1980) (noting that adverse ruling presum-
ably would have no effect in later litigation).
Although not binding, Vanlaarhoven nonetheless remains

persuasive precedent in its own right. See Metcalf & Eddy,

F.2d at [No. 91-1602, 1993 U.S. App. LEXIS 10064, at 13 n.4
(1st Cir. May 3, 1993)] (noting that immunity of agency need not
always be considered de novo; "[w]here the agency's activity and

its relation to the state remain essentially the same, prior

circuit precedent will be controlling") (emphasis added); see

also infra note 16. URI argues that much of Vanlaarhoven's

precedential weight was eroded by the later repeal of R.I. Gen.
Laws 16-31-1 to 15 in 1988, and its replacement with the new
statutory scheme. See R.I. Gen. Laws 16-59-1. We agree with

the district court that the legislative modifications in 1988
were largely inconsequential, see infra Section II.A.2.a., and

that Vanlaarhoven's "lengthy description of the fiscal relation-

ship between the University and the State of Rhode Island is as
accurate today as when it was written in 1983 . . . ." Universi-

ty of Rhode Island v. A.W. Chesterton Co., 721 F. Supp. 400, 402

(D.R.I. 1989).

11

enjoys meaningful access to, and control over, funds not appro-

priated from the State treasury; (4) possesses the status of a

separate "public corporation"; (5) may sue and be sued in its own

name; (6) can enter into contracts in its own name; (7) has been

granted a state tax exemption on its property; or (8) has been

expressly debarred from incurring debts in the State's name or

behalf. See Metcalf & Eddy, F.2d at [No. 91-1602, 1993

U.S. App. LEXIS 10064, at 11-12 (1st Cir. May 3, 1993)]; In re

San Juan DuPont Plaza Hotel Fire Litigation, 888 F.2d 940, 942

(1st Cir. 1989); Ainsworth Aristocrat Int'l Pty, Ltd. v. Tourism

Co. of Puerto Rico, 818 F.2d 1034, 1038 (1st Cir. 1987). These

diverse considerations are designed to disclose the extent to

which state law endows the incorporated State-related entity with

the operational authority, discretion, and proprietary resources

with which to function independently of the State. See George R.

Whitten, Jr., Inc. v. State Univ. Constr. Fund, 493 F.2d 177, 180

(1st Cir. 1974); cf. Metcalf & Eddy, F.2d at [No. 91-

1602, 1993 U.S. App. LEXIS 10064, at 12 (1st Cir. May 3, 1993)]

("[T]he more tightly the agency and the state are entangled, the

more probable it becomes that the agency shares the state's

Eleventh Amendment immunity.").8

8URI argues that Rhode Island case law provides a definitive
statement on the functional interdependence of the Board and the
State. See, e.g., State of Maryland Cent. Collection Unit v.

Board of Regents, 529 A.2d 144, 145 (R.I. 1987); Opinion to the

Governor, 181 A.2d 618 (R.I. 1962). State court decisions are

entitled to great deference in our diversity and sovereign
immunity determination. See Ainsworth, 818 F.2d at 1037; see

also Harden, 760 F.2d at 1163; Jackson v. Hayakawa, 682 F.2d

1344, 1350 (9th Cir. 1982) (California State University); Jag-

12

1. The Board's Operational Autonomy

After reviewing many decisions relating to public

postsecondary educational institutions, we are impressed, as was

the district court in this case and in Vanlaarhoven, by the

extraordinary measure of autonomy enjoyed by the Rhode Island

Board of Higher Education. As with most "state" universities,

the Board is charged with an essential and traditional governmen-

nandan, 538 F.2d at 1175-76; Brennan v. University of Kansas, 451

F.2d 1287, 1290 (10th Cir. 1971). But see Kovats, 822 F.2d at

1310 (state case law treating entity as "arm" does not undermine
autonomy for diversity purposes). Nevertheless, the "real party
in interest" analysis is ultimately a matter of federal law. See

Moor, 411 U.S. at 720 (looking to California state court deci-

sions merely to confirm Court's independent diversity determina-

tion, based on California statutes); Hughes-Bechtol, Inc. v. West

Va. Bd. of Regents, 737 F.2d 540, 543 (6th Cir.) (diversity),

cert. denied, 469 U.S. 1018 (1984); Long v. Richardson, 525 F.2d

74, 79 (6th Cir. 1975) (Memphis State University); cf. Jacin-

toport Corp. v. Greater Baton Rouge Port Comm'n, 762 F.2d 435,

439 (5th Cir. 1985).
In the instant case, we find the State of Maryland and its

predecessor decisions inconclusive. First, State of Maryland

involved the distinct question of the United States Supreme
Court's original jurisdiction, not the issue of diversity juris-
diction. State of Maryland, 529 A.2d at 147. Second, the court's

finding that URI and the State were the same "party" is dictum,
the State of Maryland having conceded the point. Id. Finally,

although State of Maryland cites to prior state case law, see

Opinion to the Governor, 181 A.2d 618, 621 (R.I. 1962), neither

case engages in an extended analysis of the Board's corporate
powers or characteristics. See Moor, 411 U.S. at 721 n.54

(expressing disfavor for "conclusory" determinations of entity's
legal character); Jacintoport Corp., 762 F.2d at 438 (refusing to

follow state case law on immunity question where cited cases "did
not deal with the precise question before us, nor was their
inquiry based on even analogous jurisprudential concerns"). Thus,
unlike the situation in Moor, where the Court was able to find

"the clearest indication possible from California's Supreme Court

of the status of California's counties," Moor, 411 U.S. at 720

(emphasis added), neither the focus nor the nature of the analy-
sis in State of Maryland enables us to derive a clear indication

as to the Rhode Island Supreme Court's views on the critical
factors controlling the "real party in interest" determination in
the context of federal diversity jurisdiction.

13

tal function namely, the provision of postsecondary education-

al facilities to the citizens of Rhode Island. See R.I. Const.

art. XII, 1; Chang v. University of Rhode Island, 375 A.2d 925,

933-34 (R.I. 1977); see also Kovats, 822 F.2d at 1310 (providing

educational facilities is an essential or traditional governmen-

tal function, not a proprietary one); Hall, 742 F.2d at 305

(same); Rutledge v. Arizona Bd. of Regents, 660 F.2d 1345, 1349

(9th Cir. 1981) (same); cf. also Kashani, 813 F.2d at 847-48 (if

entity serves entire state, instead of one region, more likely an

"arm" of State). As a general rule, therefore, it may well be

that an entity established to conduct a core governmental func-

tion is less likely to be vested with meaningful freedom from

governance by the State's elected officials. Nevertheless, this

isolated factor is seldom dispositive.9 An exception must lie

9For example, in Moor the county's responsibility for many

traditional and essential governmental functions, including the
provision of water services, flood control, rubbish disposal, and
harbor and airport facilities, appears to have been accepted by
the Court as affirmative evidence of citizenship. See Moor, 411

U.S. at 720. These governmental responsibilities were noted by
the Court in acknowledging the county's power to levy taxes to
finance its functions. Similarly, URI is empowered to fix and
collect tuitions and fees and enjoys plenary control over these
nonappropriated funds, as well as its educational functions. Cf.

University of Tennessee v. United States Fidelity & Guar., Co.,

670 F. Supp. 1379, 1384 (E.D. Tenn. 1987) (legislature's control
of tuition rates suggests "arm"). We discern from Moor a general

rule of thumb: the State's delegation of essential governmental
functions, together with the power to generate and control the
nonappropriated revenues with which to perform those governmental
functions, normally will be viewed as supporting, rather than
undermining, the entity's independent status for citizenship
purposes. Cf. Metcalf & Eddy, F.2d at [No. 91-1602, 1993

U.S. App. LEXIS 10064, at 17, 17 n.6 (1st Cir. May 3, 1993)]
(noting that, if all traditional government functions triggered
immunity protection, local school boards would have been deemed
"arms" of state, and that agencies which derive revenue through

14

where the statutory scheme, as a whole, confutes any legislative

intent to establish the entity as a mere "arm" of the State. See

Kovats, 822 F.2d at 1312 (performance of governmental, nonpropri-

etary function not necessarily indicative of lack of autonomy).

Accordingly, we must examine the particular powers with which the

Board is endowed under its statute of "incorporation."

From an operational standpoint, the Board is denominat-

ed a "public corporation," Moor, 411 U.S. at 719 (county's

corporate status and powers "most notabl[e]" attributes of

citizenship); cf. Hall, 742 F.2d at 305 (noting that school's

lack of separate corporate status suggests mere agency),10

which may "sue and be sued in its own name." R.I. Gen. Laws 16-

59-1(a).11 The Rhode Island statutes elsewhere define the term

"user fees" for performance of "governmental" functions are
unlikely to be characterized as "arms" merely by virtue of the
traditional nature of their mission) (citing Royal Caribbean

Corp. v. Puerto Rico Ports Auth., 973 F.2d 8 (1st Cir. 1992)).

10Some courts have held that corporate status ought not be
regarded as probative unless the legislature expresses its intent
to confer perpetual corporate status upon the entity. See, e.g.,

Hall, 742 F.2d at 299. The rationale of these cases appears to

be that the legislature reserves the right to revoke all delegat-
ed powers to such a nonperpetual entity, at any time. Id. See

also Kashani, 813 F.2d at 847; Jackson, 682 F.2d at 1350; Bren-

nan, 451 F.2d at 1290. As we are unable to accept the premise

that legislative enactments can be immunized from amendment by
succeeding legislatures, let alone be perpetuated, we respectful-
ly decline to follow these decisions. We note also that these
decisions conflict with Moor, insofar as they suggest that most

political subdivisions cannot be "citizens" because succeeding
legislatures retain the power to alter or rescind prior delega-
tions of the State's police power.

11It is not always clear in the Eleventh Amendment context
whether the court has already determined that the entity is an
"arm" of the State, and is referring to this provision (power to
sue and be sued) only as evidence of an explicit waiver of the

15

"public corporation" as "a corporate entity which is considered a

governmental agency but which has a distinct legal existence from

the state or any municipality, [and] does not constitute a

department of state or municipal government . . . ." Id. 16-

62-4 (emphasis added). See Harden v. Adams, 760 F.2d 1158, 1163

(11th Cir. 1985) (Troy State University) (holding that statutory

definitions of "state" and "political subdivision" may be rele-

vant factors); compare Kovats, 822 F.2d at 1310 (evidence that

entity is "instrumentality," but otherwise excluded from some

statutory definitions of "state," is probative of citizenship)

with United Carolina Bank, 665 F.2d at 557 (noting that entity

falls clearly within statutory definition of "state"). But cf.

dependent entity's sovereign immunity. See, e.g., Rozek v.

Topolnicki, 865 F.2d 1154, 1158 (10th Cir. 1989); Long, 525 F.2d

at 77; Soni, 513 F.2d at 352; see also supra notes 4 & 7 (discus-

sing Vanlaarhoven's alternative "waiver" holding). The bare

power to sue is unlikely to hold complete sway in the threshold
"alter ego" determination either in diversity or immunity cases.
See Kashani, 813 F.2d at 847 (power to sue and be sued not

conclusive of autonomy); Jagnandan, 538 F.2d at 1174, 1176;

Krieger, 765 F. Supp. at 760, 762; cf. Hall, 742 F.2d at 305

(deliberate withholding of power to sue highly probative of lack
of autonomy). But the power to sue in the entity's own name,
when coupled with other powers of self-determination typically
held by distinct juridical entities (power to contract, power to
buy, hold, and sell property), undeniably affords the entity some
additional independence from the State, since the entity need not
seek the State's consent to bring, defend, or settle a lawsuit.
In this case, we note in particular that (1) URI brought suit
exclusively in its own name, and (2) its counsel of record is not
a legal officer of the State of Rhode Island. See Jacintoport

Corp., 762 F.2d at 442 (noting commission's right to "employ

private attorneys to represent it" as evidence that it has
separate legal identity from State); Tradigrain, Inc. v. Missis-

sippi State Port Auth., 701 F.2d 1131, 1136 (5th Cir. 1983)

(Thornberry, J., dissenting) (noting as evidence of citizenship
that Authority "employs its own counsel, and is not represented
by the State of Mississippi in this action"); cf. Hall, 742 F.2d

at 305 (university's counsel is state attorney general).

16

Lewis v. Midwestern State Univ., 837 F.2d 197, 198 (5th Cir.),

cert. denied, 488 U.S. 849 (1988) (mere statutory definition as

"agency" suggests "alter ego"); Kashani, 813 F.2d at 847 (holding

that entity's designation as "separate" from State for some

purposes is inconclusive of autonomy); Krieger, 765 F. Supp. at

759(findingterm"independent
agency"inconclusiveevidenceofautonomy).

Ten of the thirteen Board members are appointed by the

Governor,12 with the advice and consent of the senate, see R.I.

Gen. Laws 16-59-2(a), a legislative design most courts routine-

ly view as evidence of an entity's lack of independence from

State control. See, e.g., Lewis, 837 F.2d at 198; Kashani, 813

F.2d at 847 (7 of 10 members appointed); Harden, 760 F.2d at

1163; Hall, 742 F.2d at 306; Gay Students Servs. v. Texas A & M

Univ., 737 F.2d 1317, 1333 n.28 (5th Cir. 1984), cert. denied,

471 U.S. 1001 (1985); United Carolina Bank, 665 F.2d at 558;

Rutledge, 660 F.2d at 1347 (all 8 appointed); Prebble v. Brod-

rick, 535 F.2d 605, 610 (10th Cir. 1976) (University of Wyoming).

But see Kovats, 822 F.2d at 1311 (concluding that, even if

majority is appointed by governor, that fact is not conclusive of

"alter ego" status). The power of appointment (and reappoint-

ment) is significant, and may entail risks of subtle or indirect

manipulation of the entity's decisionmaking processes by elected

officials.

12The Governor appoints the chairperson as well, and two ex

officio positions on the Board are occupied by members of the

legislative branch. Cf. Harden, 760 F.2d at 1163 (noting the fact

that executive branch officials serve as ex officio members of

Board as evidence of "alter ego" status).

17

On the other hand, the Rhode Island statutory scheme is

somewhat unusual in the respect that it attempts to protect the

Board from "partisan or personal" pressures. R.I. Gen. Laws

16-59-3 ("removal solely for partisan or personal reasons unre-

lated to capacity or fitness for the office shall be unlawful").

Although individual Board members might be vulnerable to pres-

sure, the Board as a whole is insulated to some degree from

sudden "reversal[s] of policy" by fixed (three-year) and stag-

gered terms. Id. 16-59-1. Cf. Jacintoport Corp. v. Greater

Baton Rouge Port Comm'n, 762 F.2d 435, 442 (5th Cir. 1985)

(focusing on autonomy of Commission as an entity, not only on

independence of the individual commissioners). Board members

receive minimal compensation ($50 per day of actual service, not

to exceed $3000 annually). Since it is highly unlikely that

members would depend on their Board compensation as a primary

source of income, the economic coercion attending the threat of

removal would be minimal. R.I. Gen. Laws 16-59-1(e). Aside

from the power of appointment, the governor has no direct voice

in Board decisionmaking. Cf., e.g., Fitchik v. New Jersey

Transit Rail Operations, Inc., 873 F.2d 655, 663 (3d Cir.)

(finding entity not "alter ego," despite gubernatorial veto

power), cert. denied, 493 U.S. 850 (1989). Finally, and most

significantly, individual Board members are provided with signi-

ficant insulation from partisan or personal pressure, in that no

Board member may be removed except for cause, after a full

hearing and appellate review. R.I. Gen. Laws 16-59-2, 3.

18

As a corporate entity, the Board's supervisory powers

are pervasive. It unilaterally appoints, and may dismiss at its

pleasure, the commissioner of higher education and the presidents

of the individual educational institutions it oversees, see id.

16-59-4(5), (6). It possesses plenary power over the post-

secondary school organizational structure, accounting procedures,

the creation and abolition of all postsecondary school depart-

ments and programs of study, as well as their affirmative action

hiring practices. Id. 16-59-4(10), (11). See Kovats, 822 F.2d

at 1311-12 (finding that minimal state supervision over entity's

operations suggests autonomy); cf. Hall, 742 F.2d at 306 (noting

that state control through mandated programs of study suggests

lack of independence); University of Tennessee v. United States

Fidelity & Guar, Co., 670 F. Supp. 1379, 1384 (E.D. Tenn. 1987)

(observing that entity must comply with controller's regulations,

and legislature controls physical plant operations). But see

Kashani, 813 F.2d at 847 (finding entity's power to prescribe

curricula not probative of its autonomy). The Board is expressly

exempted from compliance with the Rhode Island Administrative

Procedures Act, R.I. Gen. Laws 16-59-12, see Kovats, 822 F.2d

at 1312 (APA exemption suggests autonomy); cf. Fitchik, 873 F.2d

at 663 (APA applicability suggests "arm"); Jackson v. Hayakawa,

682 F.2d 1344, 1350 (9th Cir. 1982) (California State University)

(same); Krieger, 765 F. Supp. at 760 (same), as well as from

certain personnel employment and equipment requisition regula-

tions, R.I. Gen. Laws 16-59-21 (providing Board with exemption

19

from R.I. Gen. Laws 35-3-1(5), (6) in "the interest of educa-

tional efficiency"). See Kovats, 822 F.2d at 1313 (exemption

from civil service rules suggests autonomy); cf. United Carolina

Bank, 665 F.2d at 558 (applicability of employment regulations

suggests dependence); Krieger, 765 F. Supp. at 759-60 (lack of

exemption from general budget controls and procurement rules

suggests "arm"); University of Tennessee, 670 F. Supp. at 1384

(legislature's control of employee compensation suggests "arm").

The Board holds full legal title to all URI real and

personal property, with the attendant power to acquire, hold, and

dispose of URI property and "other like property as deemed

necessary for the execution of its corporate purposes." R.I.

Gen. Laws 16-59-1. See Moor, 411 U.S. at 719 (noting that

county may "sell, hold, or otherwise deal in property"); see also

Fitchik, 873 F.2d at 663 (power to purchase property suggests

citizenship); cf. Hall, 742 F.2d at 306 (unlike community college

which holds title to property, no independence where educational

entity may sell property only with State's approval); University

of Tennessee, 670 F. Supp. at 1384 (legislature's control over

all physical plants and leases indicates lack of indepen-

dence).13 Although URI's real and personal property is exempt

13Since the Board's legal title to URI property is held "in
trust" for the State, R.I. Gen. Laws 16-59-1(a), URI argues
that the Board's fiduciary duty to the State, the equitable owner
of the property, inhibits its discretion to administer the
property as record owner. The language of the statute neverthe-
less suggests that the Board's business decisions to purchase,
administer, and dispose of URI property are largely unrestricted,
and absent misfeasance would be impervious to challenge by the
State. See Kovats, 822 F.2d at 1309 (legal title to property,

20

from taxation, see R.I. Gen. Laws 44-3-3(1); Powers v. Harvey,

103 A.2d 551, 552 (R.I. 1954), in many cases this factor is

considered minimally probative. Often, tax policy is used by

States to encourage certain types of activity even though the

target entities are otherwise entirely independent of state

government. Rhode Island is no exception in this respect. See,

e.g., R.I. Gen. Laws 44-3-3(11) (cemeteries), (12) (incor-

porated or free libraries), (13) (veterans' organizations), (15)

(volunteer fire departments), (21) (water treatment facilities).

Moreover, nonpublic educational institutions in Rhode Island

partake of a similar tax exemption, albeit narrower than that of

the Board. R.I. Gen. Laws 44-3-3(8) (private school property

is tax exempt to the extent it is used "exclusively for educa-

tional purposes"). Arguably, of course, tax exemption may be

attributable to the State's equitable title to the URI property.

We think it at least as plausible, however, that the general

assembly exempts Board property from taxation as a means of

fostering performance of the Board's corporate functions. See

Kovats, 822 F.2d at 1311 (autonomy not fatally undermined by tax

exemption); Kashani, 813 F.2d at 846 (less probative where State

grants tax exemption to political subdivisions); Hall, 742 F.2d

at 307 (tax exemption relevant only if it is not accorded other

entities which are not "alter egos"). But see University of

though held in trust, coupled with discretionary power to dis-
pose, and to control both proceeds and income therefrom, suggests
independence); cf. Hall, 742 F.2d at 306 (entity is "arm" if

property held in State's name).

21

Tennessee, 670 F. Supp. at 1384 (university is an "arm" because

it is fully tax exempt, while private schools enjoy a partial

exemption only).

As a natural corollary to its power to control URI

property, the Board possesses,14 and freely exercises, its

corporate power to enter into contracts in its own name. See

State of Maryland Cent. Collection Unit v. Board of Regents, 529

A.2d 144, 145 (R.I. 1987); cf. Hughes-Bechtol, 737 F.2d at 544

(lack of power to contract without invoking State as named party

indicates entity is "arm"); Tradigrain, Inc. v. Mississippi State

Port Auth., 701 F.2d 1131, 1133 (5th Cir. 1983) (noting that

authority's power to enter into contract was limited; any con-

tract in excess of $2500 must be advertised and awarded to lowest

bidder); University of Tennessee, 670 F. Supp. at 1384 (entity is

"arm" where legislature exerts control over its personal services

contracts). But cf. Kashani, 813 F.2d at 847 (power to enter into

contracts not conclusive of independent status); Hall, 742 F.2d

14The Board's power to contract is not specifically
enumerated in the statute, but is implicit in the grant of "all
the [other] powers . . . usually pertaining to public corpora-
tions . . . ." R.I. Gen. Laws 16-59-1. Contrary to URI's
contention, we see no reason to infer that this general grant of
corporate power is contradicted by other statutory provisions
which specifically authorize the Board to guarantee particular
loans in the state's name, see, e.g., R.I. Gen. Laws 16-32-11

(Board empowered to guarantee student loans), 16-32-12, 14 (Board
empowered to guarantee, "in the name of the state," loans to
"societies of students" up to a total of $1.2 million; at de-
fault, loans "shall become state obligations in like manner as
any state bond"); Jacintoport Corp., 762 F.2d at 439, 441 (State-

's mere guarantee of agency's bonds is too "ancillary" an effect
to subvert agency's independence from State); see also infra note

17.

22

at 305 (same); Krieger, 765 F. Supp. at 760, 762 (same). The

Board's capacity to contract for the maintenance and repair of a

federally funded GSO research vessel likewise suggests opera-

tional autonomy. See Moor, 411 U.S. at 719 (county "may contract

for the construction and repairs of structures") (emphasis

added); cf. State Highway Comm'n of Wyoming v. Utah Constr. Co.,

278 U.S. 194, 199 (1929) (finding that entity is "arm" where

"contract for the construction of the work was between the

[defendant] and the State").

Thus, the Board's operational autonomy, approximating

that of the political subdivision in Moor, sets it apart from

most entities with similar educational missions and tips the

balance in favor of the district court's finding that the Board

is a "citizen" of Rhode Island for diversity purposes.

2. The Board's Fiscal Autonomy15

a. Statutory Scheme

Like most other public universities, URI's operations

are financed in part by State appropriations, approved annually

by the general assembly ("appropriated" funds), R.I. Gen. Laws

16-59-9 (such appropriations as the general assembly "deems

necessary"), and in part by non-State sources, such as tuition

15Although the multi-factor test is nonweighted, courts
generally agree on the primacy of the financial autonomy factor
in the overall balance. See Ainsworth, 818 F.2d at 1038 (finan-

cial accountability who pays or gets paid is the most

important factor in test); see also Fitchik, 873 F.2d at 664;

Kashani, 813 F.2d at 846 (same); Hall, 742 F.2d at 304; Rutledge,

660 F.2d at 1349.

23

charges, fees, and donations ("nonappropriated" funds). As with

all state universities, the legislature has the final say as to

the size of the annual appropriation. The Board, on the other

hand, prepares the five-year funding plan and budget for submis-

sion to the general assembly, and the Board alone "determines

priorities of expenditures." Id. 16-59-4(4). Cf. United

Carolina Bank, 665 F.2d at 558 (legislature's "comprehensive"

control of appropriated funds suggests entity's financial depen-

dence); Prebble, 535 F.2d at 610 ("No expenditure may be made in

excess of an appropriation and no money appropriated may be used

for any purpose other than for which it is appropriated.").

Furthermore, the Board has plenary authority to reallocate

appropriated funds among its various programs, facilities, and

agencies. R.I. Gen. Laws 16-59-9(c). Cf. Krieger, 765 F. Supp.

at 760 (lack of power to reallocate appropriated funds suggests

entity is "arm"). And, as noted, the Board has substantial

income from sources other than State appropriations, see Kroll,

934 F.2d at 908 n.3 (availability of substantial revenue from

other sources may be very relevant to autonomy inquiry), includ-

ing tuition charges, housing, dining and administrative fees,

donations, bequests and devises, the income and proceeds from URI

property, and federal grants.

URI's tuition and fees are set by the Board. URI's

housing, dining, and auxiliary facilities are totally self-

supporting, with no State appropriations slated for these purpos-

es after 1987. R.I. Gen. Laws 16-59-9(d). Thus, much of its

24

nonappropriated funding is roughly analogous to revenues raised

by means of a political subdivision's power to impose taxes upon

its constituents to defray the costs of the public services it

provides, a power delegated by the State to enable the political

subdivision to finance its "corporate" public service mission.

See Moor, 411 U.S. at 719-20 (county "authorized to levy taxes"

and to "issue general obligation bonds payable from county

taxes"); Metcalf & Eddy, F.2d at [No. 91-1602, 1993 U.S.

App. LEXIS 10064, at 19 (1st Cir. May 3, 1993)] (in immunity

context, "[t]he power and opportunity to generate a revenue

stream [through user fees] and thereby finance an agency's

operations is an important attribute of the agency's separate

identity"); Fitchik, 873 F.2d at 663 (power to set and collect

fares and fees tilts balance toward autonomy); see also supra

note 9; cf. Kashani, 813 F.2d at 846 (lack of power to impose

taxes is equivalent to ultimate financial dependence on the

State); Hall, 742 F.2d at 304 (same); United Carolina Bank, 665

F.2d at 558 (same); University of Tennessee, 670 F. Supp. at 1384

(legislature's control of tuition fees suggests "arm").

There is no provision in Rhode Island law permitting

State intervention in URI's income stream from inception to

expenditure. The Board's nonappropriated funds are neither

"covered into," nor merged with, the general fund, but are kept

in segregated accounts pending discretionary disbursement by the

Board "without the necessity of appropriation or reappropriation

by the general assembly." R.I. Gen. Laws 16-59-18. Compare

25

Kovats, 822 F.2d at 1308-09 (financial accounts not "within"

control of State treasury indicate autonomy), with Lewis, 837

F.2d at 197 (finding evidence of lack of autonomy in the fact

that funds must go back into State treasury, their expenditure

extremely restricted); Hall, 742 F.2d at 304 (entity is an "arm"

of the State if it has power to issue bonds, but disbursements of

bond proceeds are restricted, and if State merely "permits"

formal segregation as matter of convenience); United Carolina

Bank, 665 F.2d at 558 (nonappropriated funds deposited into State

treasury, then reappropriated for disbursement); Jagnandan, 538

F.2d at 1176 (nonappropriated funds go directly into commingled

treasury account); Krieger, 765 F. Supp. at 760 (where entity

does not "control" expenditure of funds, segregation not proba-

tive of autonomy); University of Tennessee, 670 F. Supp. at 1383-

84 (all university funds commingled in one account, subject to

state comptroller's regulations and "regular" audits). Unexpend-

ed balances in the Board's segregated nonappropriated funds

account are carried forward from year to year, awaiting discre-

tionary disbursement by the Board for "nonrecurring" items, a

practice which effectively allows the Board to exceed its annual

appropriation and its annual budget if necessary. R.I. Gen. Laws

16-59-9(b). Cf. Jagnandan, 538 F.2d at 1175 (lack of authority

to "exceed" budgeted expenditures, even from nonappropriated

funds, without approval of executive or legislature, indicates

dependency); Prebble, 535 F.2d at 610 (same).

26

Finally, the State of Rhode Island engages in but

limited monitoring of Board revenues and expenditures, see

Harden, 760 F.2d at 1163-64 (the more financial oversight, the

more likely the university's debts are state's debts), though a

few statutory provisions serve to keep the State generally

apprised of the Board's financial decisions, enabling the type of

financial monitoring usually considered indicative of a lack of

meaningful fiscal autonomy. See, e.g., Lewis, 837 F.2d at 199

(regular auditing of both appropriated and nonappropriated funds

suggests "arm"); Kashani, 813 F.2d at 845-46 (entity is "arm" as

it submits budget, and "Indiana examines [its] finances care-

fully"); Harden, 760 F.2d at 1163 (submission of annual financial

reports suggests "arm"); United Carolina Bank, 665 F.2d at 558

("extensive" reporting requirements suggest lack of autonomy);

Rutledge, 660 F.2d at 1349-50 ("detailed" report to governor);

Krieger, 765 F. Supp. at 756 (annual report to "general public"

suggests "alter ego"); University of Tennessee, 670 F. Supp. at

1379 (submission of annual report to governor or legislature,

with "detailed statement" of receipts and expenditures, indicates

"arm"). On the other hand, the level of State fiscal monitoring

of the Board is comparatively unintrusive. For example, though

URI's treasurer must submit financial reports to the state

controller for "preaudit," the purely "ministerial" audit moni-

tors Board expenditures only for possible illegality and avail-

ability of funds, not with a view to the prudence of the Board's

financial decisions. R.I. Gen. Laws 16-59-20. See Kovats, 822

27

F.2d at 1311 (mere "reporting" of spending decisions not indica-

tive of lack of autonomy). URI makes a rather wan attempt to

undermine Vanlaarhoven by citing a subsequently enacted "limita-

tion" on the Board's purchasing power. See R.I. Gen. Laws 37-

2-1 and 37-2-7(11) (Board's purchases can be made only through

State Purchasing agent's office). As the district court found,

however, nothing in this statutory requirement portends quality

review or rejection of purchase orders by the purchasing agent.

R.I. Gen. Laws 16-59-20 ("controller [shall not] interpose his

or her judgment"). See supra note 7. Far from a meaningful

limitation on the Board's power to disburse its funds, this

measure appears to have been designed solely to enable the Board

to avail itself of the financial savings associated with pooled

purchasing power.

With Moor as our benchmark, therefore, we conclude that

the Rhode Island statutory scheme demonstrates that the Board,

unlike more "typical" state educational entities, possesses the

essential attributes of operational and financial autonomy needed

to qualify as a Rhode Island "citizen" for diversity purposes.

b. "Functional Integration"

In a resourceful effort to avoid Vanlaarhoven, URI

urges its "functional integration" theory, whose genesis appar-

ently lay in our earlier "recommendation" to the district court

following dismissal of URI's interlocutory appeal. See supra p.

4. URI argues, for example, that the Board's ostensible indepen-

dence in financial matters would prove illusory if, in fact, (1)

28

the Board's annual budget were funded by State-appropriated

monies to such an extent that its nonappropriated revenues were

rendered functionally insignificant, or (2) the Rhode Island

general assembly were to employ its statutory pre-audit proce-

dures to attune the Board's annual State appropriation so as to

force the Board to expend its anticipated and accumulated nonap-

propriated revenues in lieu of a more ample annual State appro-

priation. See, e.g., Krieger, 765 F. Supp. at 761 (evidence of

actual control by State would trump evidence of formal autonomy).

We emphasize that URI does not assert the existence of

budgetary data which would demonstrate that the Board enjoys less

financial autonomy than the enabling statute indicates. More-

over, notwithstanding its efforts to persuade the district court

to conduct a separate evidentiary hearing on diversity jurisdic-

tion, URI has taken no initiative to substantiate its "functional

integration" theory, either by way of an evidentiary proffer

below, or even by way of the barest allusion to supportive data

in its brief or oral argument before this court. Instead, URI

insists that Chesterton, as the party requesting removal, see

supra Section II.A, was required to bear the entire burden of

proof and production on every conceivable fact even including

"negative" facts which might prove relevant to the Board's

citizenship status. Thus, even after trial on the merits, URI

speculates that there may be evidence which would preclude a

reliable determination as to federal diversity jurisdiction. For

the reasons hereinafter explained, we think URI inadvisably

29

banked on a cramped view of the proper allocation of the burdens

of proof and production relating to the jurisdictional issue,

misapprehended the proper role of "functional integration" data,

and exaggerated the import of our earlier "recommendation" to the

district court for further factfinding on remand.

For some reason, our earlier invitation to engage in

additional factfinding on remand went unheeded. URI intimates

that it did all it could by requesting a separate evidentiary

hearing, and that the district court simply discounted our

recommendation as to the possible relevance of "functional

integration" evidence. In our view, however, URI mischarac-

terizes the remand order. While we suggested the desirability of

supplementary factfinding, the precise factfinding procedure to

be employed always rests within the sound discretion of the trial

court. See Foman v. Davis, 371 U.S. 178, 182 (1962); O'Toole v.

Arlington Trust Co., 681 F.2d 94, 98 (1st Cir. 1982) (finding no

abuse of discretion, as "the court was under no obligation to

require an evidentiary hearing . . . [but] has the right to

determine the procedures it will employ to decide a jurisdiction-

al issue") (citation omitted). At no time did we require a

separate evidentiary hearing on the jurisdictional issue.

Indeed, given our alternative ground for dismissing URI's inter-

locutory appeal namely, that it appeared unlikely that a trial

on the merits would be prolonged the district court's decision

to defer its jurisdictional determination until trial was entire-

ly consistent with the remand order.

30

Nor did the district court prevent URI from introducing

any such statistical evidence at trial. Following an unrecorded

pretrial conference with counsel, the district court did deny

URI's motion for a separate evidentiary hearing. In that connec-

tion, URI has provided no indication of the legal contentions

advanced by either party at the pretrial conference, nor of the

grounds for the district court's decision to bypass a pretrial

evidentiary hearing. Chesterton, on the other hand, asserts that

the conference involved an extended discussion about the appro-

priateness of a separate pretrial hearing, but that the court

opted to permit the presentation of evidence on the jurisdiction-

al issue at trial.

Viewed in proper procedural context, therefore, the

present claim hinges entirely on URI's unremitting allocation of

the burdens of persuasion and production to Chesterton, and not

on any lack of opportunity to raise or substantiate its "func-

tional integration" claim. Significantly, our remand order took

no position as to which party would be obliged to come forward

with evidence of functional integration, nor did it suggest that

proof of lack of functional integration was required in every

case.

Of course, Chesterton, the party invoking diversity

jurisdiction, bears the ultimate burden of proving diversity of

citizenship. See Topp v. Compair, Inc., 814 F.2d 830, 839 (1st

Cir. 1987). Nevertheless, there is more to be said concerning

the burden of production:

31

[T]he party who invoked diversity juris-
diction has the burden of proving all facts
upon which jurisdiction could be sustained.
If [the invoking party] does construct a
prima facie showing of diversity, [the chal-
lenging party] must overcome or rebut this
showing in order to dismiss the [removal
petition]. Support for [the challenger's]
position may be derived from affidavits,
depositions, and sworn statements filed by
the parties from which the Court can examine
and evaluate all relevant factors and sur-
rounding circumstances but the exact method
of determining the jurisdictional issue lies
within the sound discretion of the district
court.

United States Fidelity & Guar. Co. v. Di Massa, 561 F. Supp. 348,

350 (E.D. Pa. 1983) (citation omitted). Although neither

Chesterton nor URI submitted affidavits, depositions, or sworn

statements, the district court properly conducted inquiry into

the controlling jurisdictional facts, pursuant to Moor, by

examining the Rhode Island enabling statute. Under Moor, such an

inquiry is designed primarily to provide the court with a compe-

tent basis for determining the legal framework within which the

relationship between a State and a State-created entity are

required to function. In the present case, the Rhode Island

enabling statute constituted a sufficient proffer on the issue of

the Board's financial autonomy. See, e.g., Tradigrain, 701 F.2d

at 1132 ("the state's constitutional, statutory, and decisional

law" comprise source material for the court's citizenship analy-

sis); see also Indiana Port Comm'n v. Bethlehem Steel Corp., 702

F.2d 107, 109 (7th Cir. 1983); cf. supra note 8.

As noted, see supra Section II.A.2.a, the enabling

statute's broad grant of control to the Board over non-

32

appropriated revenues weighs heavily in Chesterton's favor and

satisfied its prima facie burden on the issue of financial

autonomy. Furthermore, financial autonomy is but one component

of the fact-intensive citizenship inquiry mandated by Moor, and

Chesterton prevailed on most other relevant jurisdictional facts

as well. See supra Section II.A.1. It was incumbent on URI,

therefore, to mount an effective challenge to the prima facie

showing of financial autonomy. See Ohio Nat'l. Life Ins. Co. v.

United States, 922 F.2d 320, 327 n.7 (6th Cir. 1990) ("That the

burden of proof is always on the [party asserting jurisdiction]

does not mean that a [challenger], without any proof on his part,

can put the [party asserting jurisdiction] to proof by affidavit

of jurisdictional facts sufficiently alleged in the complaint.

The [challenger] must at least submit some proof that the juris-

dictional facts so alleged do not exist.") (citation omitted)

(emphasis added). Absent evidence or a compelling argument that

the fiscal autonomy permitted the Board under Rhode Island law,

as determined by the district court, does not actually obtain,

URI failed to overcome Chesterton's prima facie showing.16

16Moreover, in view of the presumptive deference due
Vanlaarhoven in the present context, see supra note 7, URI's

"functional integration" theory was not being written on a blank
slate. See, e.g., Rollins v. Board of Governors for Higher

Educ., 761 F. Supp. 930, 931 (D.R.I. 1990) (citing Vanlaarhoven

as precedent); cf. Cowan v. University of Louisville Sch. of

Medicine, 900 F.2d 936, 940 (6th Cir. 1990) (proper to rely on

federal court precedent finding school not autonomous); Dube v.

State Univ. of New York, 900 F.2d 587, 594 (2d Cir. 1990) (SUNY)

(same), cert. denied, 111 S. Ct. 2814 (1991); Thompson v. City of

Los Angeles, 885 F.2d 1439, 1443 (9th Cir. 1989) (University of

California) (same); Schuler v. University of Minnesota, 788 F.2d

510, 516 (8th Cir. 1986) (same), cert. denied, 479 U.S. 1056

33

Furthermore, challenges to subject matter jurisdiction

typically arise early in the litigation, and even though Eleventh

Amendment immunity and diversity jurisdiction may require fact-

intensive inquiries, see Kroll, 934 F.2d at 908 n.2, we see no

justification for requiring the removing party to resort to

formal discovery before the opposing party with readier access

to the evidence raises a specific dispute relating to a duly

alleged jurisdictional fact. Such a requirement would invite

needless waste of judicial resources on a threshold issue which

must be resolved as expeditiously as practicable. See Tanzymore

v. Bethlehem Steel Corp., 457 F.2d 1320, 1323 (3d Cir. 1972) (no

need for evidentiary hearing on jurisdictional question if no

facts are in genuine dispute).

Without statistical evidence, URI's rebuttal was

exceedingly thin. Nevertheless, because it is clear that the

Board is "dependent" on the State for some unknown portion of its

revenues, we will assume, arguendo, that certain provisions of

the enabling statute cited by URI did give rise to a genuine

dispute over an important jurisdictional fact whether the

Board actually enjoys financial autonomy from the State. See,

e.g., R.I. Gen. Laws 16-59-5 (Board must hold annual meeting to

discuss budget and "invite" members of general assembly); id.

16-59-9(c) (all proposals for tuition increases must be made

before State appropriates funds for fiscal year).

(1987); Goss, 588 F.2d at 98-99 (same).

34

As far as we can discern from the case law, in only

three situations has the financial autonomy authorized by an

enabling statute been considered illusory. First, "functional

integration" may obtain if the State nonetheless bears the

ultimate legal responsibility to answer for debts on which the

state university defaults. Thus, the very financial independence

accorded the Board under the Rhode Island enabling statute

ultimately might expose the State treasury to liability for the

Board's financial obligations. In Kovats, 822 F.2d at 1309, the

Third Circuit flatly rejected such a functional integration claim

where the legislature's decision to answer for the university's

debts appeared to be purely discretionary and not legally bind-

ing. Cf. also Fitchik, 873 F.2d at 661 (the State's disclaimer

of any obligation to "cover" is the primary consideration, not

the relative size (50-70%) of the state appropriation); but cf.

Hall, 742 F.2d at 304-05 (no statute prohibits university from

incurring debt in state's name, and fact that state will have to

"cover" debt by law is indicative of "alter ego" status); Krie-

ger, 765 F. Supp at 761 (where District of Columbia expressly

committed itself to funding, agency not wholly "self-supporting"

is "mere arm").

Even if a state's ultimate legal obligation to "cover"

a university's financial obligations were the controlling consi-

deration in the diversity context, however, but see Moor, 411

U.S. at 719 (noting that the county, "and from all that appears

the county alone, is liable for the judgments against it")

35

(emphasis added), the Rhode Island statutory scheme evinces no

conclusive answer as to whether the State is so obligated. We

have neither been cited to, cf. supra note 8, nor have we found,

statutory language governing whether the State of Rhode Island

ultimately is responsible for the Board's corporate financial

obligations. Cf. Metcalf & Eddy, F.2d at [No. 91-1602,

1993 U.S. App. LEXIS 10064, at 13-14 (1st Cir. May 3, 1993)]

(statute explicitly divested Puerto Rico Aqueduct and Sewer

Authority of power "to pledge the credit or taxing power of the

Commonwealth," thereby "erect[ing] a wall between the agency's

appetite and the public fisc.").17

Second, the amount of the Board's nonappropriated

funding, either in absolute or relative terms, might be consid-

ered so insubstantial as to leave the Board financially dependent

on the State. But even assuming, arguendo, that an entity

receiving any State funding or subsidy is thereby inevitably

rendered susceptible to State pressure, two principles remain

constant. First, an incorporated entity dependent entirely on

State appropriations rarely (if ever) would escape characteriza-

tion as the State's "alter ego," since the hand that holds all

the purse strings presumably controls the dependent entity. See,

17The only provision remotely on point empowers the general
assembly to appropriate such funds to the Board as the general
assembly "deems necessary," R.I. Gen. Laws 16-59-9 (emphasis

added), as distinguished from such amount as "is necessary."
Furthermore, as we have noted, the general assembly purposively
delineated narrow categories of Board "debts" (e.g., student loan

guarantees) which would become "state obligations," a seemingly
superfluous undertaking if the State implicitly underwrites all
Board financial obligations. See supra note 14.

36

e.g., State Highway Comm'n, 278 U.S. at 199 (finding no diversity

where Highway Commission, despite its power to sue and be sued,

"had no funds or ability to respond in damages"); Neves, 837 F.2d

at 534 (where monies "will inure exclusively to the benefit of

the public fisc," the diversity inquiry is at an end); Culebras

Enters. Corp. v. Rios, 813 F.2d 506, 517 (1st Cir. 1987) (Puerto

Rico conservation authority is "alter ego" notwithstanding its

power to sue and be sued, where agency directors attested, and

plaintiffs did not dispute, that "the agency would not have the

funds to satisfy a judgment and that such would have to be

satisfied from the general budget of [Puerto Rico]"); see also

Kashani, 813 F.2d at 846 (lack of other funding "ensures ultimate

fiscal reliance on state"); Gay Students Servs., 737 F.2d at 1333

n.28 (same); Hughes-Bechtol, 737 F.2d at 543 ("board has no funds

or ability to respond in damages"); Ronwin, 657 F.2d at 1073

(given State's comprehensive provisions for risk management, "no

evidence that the Board, acting in its corporate capacity, could

satisfy a libel judgment in any way other than by turning to the

state of Arizona"). URI must concede that the Board does not

fall within this bright-line category.

On the other hand, mere receipt of state appropriations

is not conclusive evidence of the recipient entity's "alter ego"

status. Many (if not most) political subdivisions routinely

receive significant state appropriations, but are characterized

as autonomous entities for immunity and diversity purposes. See,

e.g., Mount Healthy, 429 U.S. at 280-81 (city board of education,

37

which received "significant amount" of state funding, not enti-

tled to immunity where State granted board the power to raise its

own revenue); Gary A. v. New Trier High Sch. Dist., 796 F.2d 940,

945 (7th Cir. 1986) (noting that the "fact that a local school

district receives 'a significant amount of money from the state'

does not mean that it is an arm of the state") (emphasis added)

(citation omitted). In the Eleventh Amendment immunity context,

we recently rejected just such a contention:

We think [that the Puerto Rico Aqueduct and
Sewer Authority's] situation is not unlike
that of a typical political subdivision. Such
an entity often receives part of its budget
from the state and raises the rest indepen-
dently. Despite this dual funding, such enti-
ties do not automatically (or even usually)
come within the zone of protection demarcated
by the Eleventh Amendment . . . despite the
"significant amount of money" [they] received
from the state.

Metcalf & Eddy, F.2d at [No. 91-1602, 1993 U.S. App.

LEXIS 10064, at 15 (1st Cir. May 3, 1993)] (citations omitted).

Nevertheless, under Moor, the courts are expected to

consider available statistical evidence in arriving at a more

precise assessment of the relative "significance" of the appro-

priated and nonappropriated funding which goes into the universi-

ty budget. See Kovats, 822 F.2d at 1308 (entity is "citizen"

even though state appropriation is "large," or approximately 50

to 70% of budget). But see Kashani, 813 F.2d at 845 (33% appro-

priation suggests "arm"); Hall, 742 F.2d at 304 (average 64%

state appropriation suggests "arm"); Jagnandan, 538 F.2d at 1175

(maximum 72% state appropriation suggests "alter ego"). In the

38

present case, however, neither the amount nor the percentage of

the Board's nonappropriated revenues can be ascertained from the

record. Thus, argues URI, the district court was compelled to

find that Chesterton did not sustain its burden of proof on the

Board's financial autonomy.

In characterizing such statistical data as indispens-

able jurisdictional "facts," however, URI misconstrues our case

law,18 as well as Supreme Court precedent. We have never inti-

mated that such statistical information is itself a jurisdiction-

al fact, the absence of which would invariably defeat diversity

jurisdiction. The core jurisdictional fact, after all, is

financial autonomy. Under the seminal Supreme Court decisions

18On occasion, we have adverted to this kind of statistical
evidence in the appellate record, as confirmation that a party

could not establish diversity. See Perez v. Rodriguez Bou, 575

F.2d 21, 25 (1st Cir. 1978) (in dicta, noting that the "extent
and nature" of the Commonwealth's support for the University of
Puerto Rico suggested lack of autonomy, but without describing
precise statistics, or stating whether University had other forms
of substantial nonappropriated income). On other occasions, we
have remanded for further factfinding where it appeared that the
autonomy equation was so evenly balanced that the proponent on
the jurisdictional issue could not meet its ultimate burden of
proof without resort to such statistical information, see, e.g.,

Ainsworth, 818 F.2d at 1038-39 (noting various factors supporting

and undermining autonomy, and remanding to district court for
hearing on whether entity receives "significant funding" from the
Commonwealth), and that the parties had not been afforded a full
and fair opportunity to present evidence in the trial court. Id.

at 1038 n.23 (as an alternative reason for remand, noting fact
that proponent had not raised the "alter ego" issue until its
appellate reply brief, denying opponent "the opportunity to argue
. . . or to rebut" the proponent's contentions). Thus, in our
earlier denial of the interlocutory appeal in this case, we acted
on the side of caution and judicial economy in recommending that
the district court allow the parties an opportunity to present

this kind of evidence, on the chance that it might be needed to
tip the "alter ego" balance in the final analysis.

39

dealing with both immunity and diversity, there is a noticeable

lack of reliance on such statistical data, a fact which confutes

its indispensability. See, e.g., Mount Healthy, 429 U.S. at 280-

81 (noting only "significant amount of money" received from

State) (emphasis added); Moor, 411 U.S. at 719-20 (discussing

county's ability to raise its own funds, not whether county

received any funds from State); see also Metcalf & Eddy, F.2d

at [No. 91-1602, 1993 U.S. App. LEXIS 10064, at 15 (1st Cir.

May 3, 1993)]. Unsurprisingly, as the divergent conclusions

reached on essentially similar "statistical" evidence suggest,

see supra pp. 37-38, a closely calibrated" statistical" approach

in these cases entails its own impediments to reliable decision-

making; namely, at what levels should the absolute or relative

size of an entity's appropriated funding be considered so sub-

stantial, or its nonappropriated funding so insubstantial, that

"functional integration" is to be presumed, or a previous judi-

cial determination of the entity's citizenship set aside? We

believe a wide margin of variance would need to be demonstrated

before it could be found to have effected a sea change in the

entity's jurisdictional status. After all, while not immutable,

the citizenship of a public corporation, like its domicile,

should be accorded a reasonable measure of permanence; at the

very least, ordinary fluctuations in the university's budget

ought not occasion continual judicial reevaluation. Thus, trial

court rulings on subject matter jurisdiction normally ought not

await budgetary data and oscillations absent an evidentiary

40

proffer of sufficient import to alter a determination based on an

analysis of state statutory and decisional law. In our view,

this approach best comports with the analysis contemplated in

Moor.

In considering whether Chesterton carried its burden of

persuasion on the issue of financial autonomy, we think it is

inescapable that the Board's nonappropriated revenues represent a

substantial budget component; tuition, housing, dining and admin-

istrative fees, donations, bequests, federal grants, and the

proceeds from discretionary sales and leases of URI property are

not insubstantial revenue sources. Thus, on its face, the

enabling statute demonstrates Board access to, and control over,

substantial amounts of nonappropriated revenues. Following a

trial on the merits, and absent any indication that URI did not

have a fair opportunity to identify and produce statistical

evidence which might rebut Chesterton's demonstration that the

enabling statute confers the requisite financial autonomy to

qualify the Board for citizenship under Moor, we conclude that

URI's appellate challenge comes too late.

Finally, in a similar vein, URI suggests that it might

be that the State routinely attunes its annual appropriation to

the Board in response to the total amount of nonappropriated

funds available to the Board, including the nonappropriated funds

accumulated from prior fiscal years and those anticipated in the

current fiscal year. Under this "linkage" theory, the State

could compel the Board to expend all accumulated and anticipated

41

nonappropriated funds merely by limiting its annual appropria-

tions to the difference between the Board's fiscal year revenue

requirements and the total available nonappropriated funds.

URI's contention that the State might link its appro-

priations to the availability of nonappropriated Board funds is

pure conjecture. Arrayed against URI's conjecture are the

explicit provisions of the enabling statute, as amended in 1988,

which expressly state that all nonappropriated funds, including

accumulated nonappropriated funds, are to be deposited in a

segregated account under the exclusive control of the Board. See

Kovats, 822 F.2d at 1308-09 (mere possibility of offset by state

appropriations not especially probative of "alter ego" status).

Appropriated funds, on the other hand, are to be set apart in a

separate account, and all unexpended balances in the appropriated

funds account are to be redeposited to the general fund. Unex-

pended nonappropriated funds, however, are carried over from year

to year in the Board's nonappropriated funds account. This

separate treatment of appropriated and nonappropriated funds,

deliberately mandated by the general assembly, would have been

both superfluous and contraindicated had routine "linkage" been

intended. Cf. Allende v. Shultz, 845 F.2d 1111, 1117 (1st Cir.

1988) (in general, courts should avoid interpretations which

would render a statutory provision meaningless). In the absence

of any countervailing showing, the Board's financial autonomy, as

ordained by the general assembly in the enabling statute, was

42

sufficient to sustain Chesterton's burden of proof on the central

jurisdictional fact at issue under 28 U.S.C. 1332.

Accordingly, having weighed the myriad factors contem-

plated by Moor, we conclude that the district court correctly

determined that Chesterton met its ultimate burden of estab-

lishing that the Board enjoys "a sufficiently independent corpo-

rate character to dictate that it be treated as a citizen of

[Rhode Island]." Moor, 411 U.S. at 721.

B. Evidence of Damages

In a ruling that proved fatal to URI's claims for

damages for breach of warranties, the district court excluded the

testimony of URI's longtime controller, Ronald Osborne, a certi-

fied public accountant in charge of all URI financial information

and accounting practices. URI called Osborne as an expert

witness to establish the amount of money it spent to correct the

corrosion problem allegedly left unremedied by Chesterton's 1-2-3

System. URI proffered no other evidence on damages. Osborne

testified on direct examination that he previously had performed

cost assessments on various URI projects, and that his usual

procedure was to consult URI financial records and conduct

interviews with URI personnel involved in the particular project.

He consulted GSO records to ascertain the overtime hours worked

in 1985, and conducted several interviews with URI employees and

various "private vendors" to ascertain which overtime hours were

attributable to the correction of Endeavor's corrosion problem.

To these figures he added the cost of fringe benefits (22%) for

43

overtime employees, and "indirect costs," at an unspecified

percentage rate, which included expenses for "accounting, pur-

chasing, maintenance, [and] utilities." Before Osborne could

state an opinion concerning the total monetary damages sustained

by URI, Chesterton objected on the grounds that (1) Osborne was

not a qualified expert on damages calculation, (2) the factual

bases for his calculation included inadmissible hearsay, and (3)

the damages calculation included inappropriate factors, such as

"indirect costs."

URI relied on Federal Rules of Evidence 703 and 705 as

grounds for the admission of Osborne's expert opinion. Rule 703

provides that "[t]he facts or data . . . upon which an expert

bases an opinion or inference . . . [,] [i]f of a type reasonably

relied upon by experts in the particular field in forming opin-

ions or inferences upon the subject, . . . need not be admissible

in evidence." Fed. R. Evid. 703. Rule 705 provides that "[t]he

expert may testify in terms of opinion or inference and give

reasons therefor without prior disclosure of the underlying facts

or data, unless the court requires otherwise. The expert may in

any event be required to disclose the underlying facts or data on

cross-examination." Fed. R. Evid. 705 (emphasis added). The

court sustained Chesterton's objection on the ground that URI had

not demonstrated that the facts relied on by Osborne were of a

type reasonably relied on by experts in damages assessment.19

19The court also expressed a firm preference for requiring
preliminary disclosure of the factual "background" for an ex-
pert's opinion on direct examination. The court considered this

44

URI's central arguments on appeal are: (1) Rules 703

and 705 afford the right to present unsubstantiated expert testi-

mony on direct examination without first disclosing its factual

underpinnings, and (2) the district court abused its discretion

by adhering to its self-imposed rule of exclusion, a per se rule

which, according to URI, runs counter to the "burden shifting"

implicit in Rule 705 and disregards the obligation to predicate

its exclusionary ruling on the particular circumstances.

We have no doubt that Rules 703 and 705 permitted the

district court to admit Osborne's opinion testimony, see

International Adhesive Coating Co. v. Bolton Emerson Int'l, 851

F.2d 540, 545 (1st Cir. 1988) (business and financial records are

"obvious" sources relied on by accountants in ascertaining

damages), subject of course to Chesterton's right to probe the

premises of the opinion on cross-examination. But that is not

the question presented. Rather, the issue on appeal is whether

the district court abused its considerable discretion by exclud-

ing the evidence. We think not.

Rules 703 and 705 normally relieve the proponent of

expert testimony from engaging in the awkward art of hypothetical

questioning, which involves the somewhat meticulous, and often

tedious, process of laying a full factual foundation prior to

procedure preferable to the alternatives, which were (1) to allow
the evidence in on direct, then exclude it later if it were found
wholly unreliable, or (2) to permit Chesterton to shoulder the
burden of testing the reliability of Osborne's methods on cross-
examination, leaving the ultimate weight of the evidence to the
jury.

45

asking the expert to state an opinion. In the interests of

efficiency, the Federal Rules of Evidence deliberately shift the

burden to the cross-examiner to ferret out whatever empirical

deficiencies may lurk in the expert opinion. Nevertheless, Rules

703 and 705 do not afford automatic entitlements to proponents of

expert testimony. Rule 703 requires the trial court to give

"careful consideration" to any inadmissible facts upon which the

expert will rely, in order to determine whether reliance is

"reasonable." Id. at 545. Similarly, under the broad exception

to Rule 705 ("unless the court otherwise requires"), the trial

court is given considerable latitude over the order in which

evidence will be presented to the jury. See Fed. R. Evid. 705

advisory committee's note ("[S]afeguards [to minimize 'unfair'

burden on cross-examiner] are reinforced by the discretionary

power of the judge to require preliminary disclosure in any

event.") (emphasis added). While the trial court's discretion is

not unfettered, at a minimum the rules suggest that the proponent

must be prepared, if the court so requires, to make a limited

offer of proof to aid the court in its assessment. Cf. Ambrosini

v. Labarraque, 966 F.2d 1464, 1469 (D.C. Cir. 1992) ("A court

must know the basis for an expert's opinion before it can deter-

mine that the basis is not of a type reasonably relied on by

experts in the field."); Head v. Lithonia Corp., 881 F.2d 941,

944 (10th Cir. 1989) (despite the liberality of Rule 703, court

must not abdicate its responsibility to assure "minimum stan-

dards" for admissibility as required by Rule 104(a)).

46

Even though URI's threshold burden was minimal, and may

have been readily met, it made no attempt whatever to assuage the

district court's legitimate concerns, but chose instead to rely

on its perceived "right" to have Osborne's opinion admitted under

Rule 703. Apparently, URI came to trial with no supporting

documentation whatever to substantiate Osborne's assessment of

damages. Based on what can be gleaned from Osborne's preliminary

testimony, URI's apparent unpreparedness and recalcitrance may

have given the district court real concerns as to Osborne's

methodology. Unlike the expert witness in International Adhe-

sive, Osborne's "damages" assessment was not based solely on the

conventional examination and compilation of documents from which

an expert objectively might ascertain the overtime labor costs

incurred in repairing Endeavor's ballast tanks, as distinguished

from various other projects at URI and the GSO. Rather, Osborne

relied on "interviews" with undisclosed URI employees and "out-

side vendors," conducted either by himself or other URI officials

who reported to him. The trial court quite reasonably expected

URI to explain, out of the presence of the jury, the basic

assumptions undergirding its witness's seemingly unorthodox

method of reconstruction.

Rather than provide an explanation, however, URI simply

accepted a directed verdict on the issue of damages. Moreover,

when pressed by the district court, URI indicated no inclination

to pursue a claim for nominal damages. Although we are given

some pause by the district court's blanket statement that it

47

"always requires" the proponent to disclose on direct examination

the factual basis for an expert opinion, cf., e.g., Lis v. Robert

Packer Hosp., 579 F.2d 819, 822, 822-23 (3d Cir.) (expressing

disapproval of trial court's statement that it invariably exer-

cises its discretion to invoke the Rule 611(b) exception), cert.

denied, 439 U.S. 955 (1978), there was no abuse of the court's

broad discretion in this case, as a sound basis existed for

requiring disclosure.

III

CONCLUSION

We need proceed no further with this endeavor.20

20URI raises two other arguments on appeal. First, it
contends that the district court abused its discretion by denying
its motion to file a second amended complaint in November 1991
eighteen months after the filing of its original complaint, and
following jury impanelment since URI asserted valid reasons
for its lack of diligence. See Quaker State Oil Refining Corp.

v. Garrity Oil Co., 884 F.2d 1510, 1517 (1st Cir. 1989) (due

diligence required for amendments). As far as we can discern,
the amendment's only significant factual supplementation to the
original complaint would allege that Chesterton's representatives
"came aboard the Research vessel Endeavor while the Chesterton 1-
2-3 System was actually being applied and said nothing as to its
not being equal to the task of painting the ballast tanks." The
amended complaint generally shifted the focus of URI's allega-
tions from Chesterton's defective manufacture of a product to
Chesterton's negligence in recommending an ill-suited product, or
its failure to give adequate or continuing instructions on its
use. Chesterton suffered no prejudice, however, as most of these
new factual matters were in fact "tried by express or implied

consent of the parties," Fed. R. Civ. P. 15(b). In any event, as
the substance of the proposed amendments was wholly unrelated to
the issue of damages, amendment would have been futile. See

Arzuaga-Collazo v. Oriental Fed. Sav. Bank, 913 F.2d 5, 7 (1st

Cir. 1990) (amendment futile if there is no "meaningful indica-
tion" that amendment would make a "dispositive difference")
(citing The Dartmouth Review v. Dartmouth College, 889 F.2d 13,

48

Absent competent evidence of damages, the district court properly

granted judgment as a matter of law in favor of Chesterton on

URI's breach of warranty claims.

The judgment of the district court is affirmed.

- Concurring Opinion Follows -

22-23 (1st Cir. 1989)).
Similarly, URI contends that the district court improperly
directed a verdict for Chesterton on Count III of the complaint,
which alleged Chesterton's breach of a warranty of fitness for a
particular purpose. URI merely argues that it presented suffi-
cient evidence to establish that Chesterton had reason to know
that URI intended to use the product on salt water ballast tanks,
and that URI specifically relied on Chesterton's assurances of
suitability. Once again, however, absent proof of damages, URI's
argument is to no avail.

49

HORNBY, District Judge, concurring. It takes the court
HORNBY, District Judge, concurring.

38 typed pages (8-1/2 x 11") of closely reasoned text to decide

whether the University of Rhode Island is a citizen -- a determi-

nation that has nothing to do with the substance of the real

world dispute between these parties, but simply resolves where to

try their lawsuit. Is this approach really essential for deter-

mining whether a federal court has jurisdiction? Granted that

our system limits the jurisdiction of federal courts, a rational

observer might nevertheless expect simple gatekeeping rules for

what gets in and what is kept out. A litigant should be able to

ascertain, with relatively modest effort and legal fees, where to

bring its lawsuit. But if the court's analysis of a "myriad

factors" -- which are "by no means exhaustive" -- is to be the

governing standard, future litigants in cases involving similar

state agencies had better be prepared to pay a lot of legal fees

for their lawyers to (1) read and digest the prose; (2) gather

the relevant information and apply the legal analysis to their

client or opponent; (3) litigate the issues at pretrial, trial

and on appeal. Those litigants had also better be prepared for

delays in decisionmaking as lawyers and judges ponder the issue:

the "myriad factors" will seldom yield a certain outcome until a

court actually decides the issue.

To be sure, this court is not alone in adopting this

approach. Other courts have also applied a multitude of factors

(with no particular weight assigned), in determining the status

50

of a particular state agency. See, e.g., Hughes-Bechtol, Inc. v.

West Virginia Bd. of Regents, 737 F.2d 540, 543-44 (6th Cir.),

cert. denied, 469 U.S. 1018 (1984) (looking at several factors);

Krieger v. Trane Co., 765 F. Supp. 756, 758 (D.D.C. 1991) (exam-

ining seven factors); University Sys. of New Hampshire v. United

States Gypsum Co., 756 F. Supp. 640, 645 (D.N.H. 1991) (citing

eight factors); University of Tennessee v. United States Fidelity

& Guar. Co., 670 F. Supp. 1379, 1386-87 (E.D. Tenn. 1987) (con-

sidering, arguendo, a nine-factor approach). The result is great

unpredictability. As the commentaries recognize, "[t]here is no

unanimity among the decisions as to whether state agencies or

departments are citizens within the meaning of 28 U.S.C.S.

1332, with some decisions holding that they are while others

hold that they are not." 1 Federal Proc. L. Ed. 1:200. The

ensuing extensive litigation over jurisdiction has undoubtedly

caused substantial delay and consumed thousands of dollars in

attorney fees where the real goal should have been speedy and

inexpensive resolution of the merits of the underlying dispute.

The question is whether United States Supreme Court

precedents really require such a complex analysis. I think not.

I will concede that this court's approach is one plausible

reading of the precedents, but there is another plausible reading

that keeps the subject matter jurisdiction issue in proper

perspective as only a preliminary issue in the underlying econom-

ic dispute between the parties.

51

As the court recognizes, a couple of propositions are

beyond debate, given United States Supreme Court decisions.

First, a State cannot be a citizen of itself: "There is no

question that a State is not a `citizen' for purposes of the

diversity jurisdiction." Moor v. County of Alameda, 411 U.S.

693, 717 (1973). Second, incorporated branches of state govern-

ment (for example, cities and counties) are citizens of the state

of their incorporation. See Cowles v. Mercer County, 74 U.S. (7

Wall.) 118, 122 (1869). This resulting principle of independent

citizenship for a public corporation had become so "well settled"

by 1972 that the Supreme Court no longer stopped to question it.

See Moor, 411 U.S. at 718, quoting Illinois v. City of Milwaukee,

406 U.S. 91, 97 (1972).

Here, the Rhode Island Board of Higher Education1 is

separately incorporated with the power to sue and be sued. The

diversity statute provides: "[A] corporation shall be deemed a

citizen of any state by which it has been incorporated . . . ."

28 U.S.C. 1332(c). What more need be said to conclude that the

Rhode Island Board is a citizen for diversity purposes? The

court apparently believes that its lengthy and complex analysis

is required by Moor. But in Moor the Supreme Court spent only

one paragraph summarizing California statutes to conclude that

the county was a corporation with important powers independent of

the state and a second paragraph summarizing a California Supreme

1I agree with the court that there is no legal entity under
Rhode Island law known as the University of Rhode Island.

52

Court decision finding California counties to be corporations.

Based on those two summary paragraphs, the Supreme Court conclud-

ed that "the county has a sufficiently independent corporate

character to dictate that it be treated as a citizen of Califor-

nia under our decision in Cowles v. Mercer County, supra." 411

U.S. at 721.

A parallel short treatment of Rhode Island law can dispose

of the jurisdictional issue in this case. The Board that governs

the University of Rhode Island is a "public corporation, empow-

ered to sue and be sued in its own name, to have a corporate

seal, and to exercise all the powers, in addition to those

hereinafter specifically enumerated, usually appertaining to

public corporations entrusted with control of post-secondary

educational institutions and functions." R.I. General Laws 16-

59-1-(a) (1992). Under Rhode Island law, a "public corporation"

is "a corporate entity which is considered a governmental agency

but which has a distinct legal existence from the state or any

municipality, [and] does not constitute a department of state or

municipal government . . . ." Id. 22-10-2(f). The Board has the

corporate power to acquire, hold, and dispose of real and person-

al property (albeit in trust for the state). Id. 16-59-1(b).

The Board is entitled to levy tuition and other fees in order to

obtain funds to carry out its activities. Id. 16-59-9. Its

receipts from sources other than state appropriations do not go

into the state's general fund and are subject to use at the

Board's order. Id. 16-59-18. It appoints the presidents of

53

postsecondary institutions and has a great deal of authority in

determining what postsecondary education will be available to

Rhode Island citizens. Id. 16-59-4, 8. This summary paints a

picture of a "sufficiently independent corporate character" to

match that of the California county at issue in Moor. No more

should be necessary.2 I therefore concur in the court's evalua-

tion that jurisdiction exists, but not in the prolonged reasoning

by which it reaches that conclusion.

I add one postscript: The careful reader will observe

that neither I nor the court have articulated any jurisdictional

policy arguments in determining the citizenship of the Board.

The policy interests behind the court's myriad factor approach

are borrowed -- I believe ill-advisedly -- from Eleventh Amend-

ment cases where the primary goal is to protect the state trea-

sury. Perhaps the court's complex analysis and case-by-case

approach are justified there. The policy goals in diversity

jurisdiction analysis are somewhat different, involving avail-

ability of an unbiased forum. The Supreme Court has not ad-

2Since the Board is a public corporation, it seems unneces-
sary to pursue the "arm or alter ego" alternative set forth in

State Highway Comm'n of Wyoming v. Utah Constr. Co., 278 U.S.

194, 199 (1929). There, a lawsuit was brought against the
Wyoming State Highway Commission (an unincorporated state agency)
and its individual members, premised on diversity of citizenship.
The Supreme Court found no diversity jurisdiction. Primarily,
the Court determined that the suit was not really against the
Highway Commission but against the State of Wyoming itself,
because it was the State that was actually a party to the con-
tract in dispute and neither the Commission nor any of its
members had assumed any responsibility. The sentence most often
quoted (and referred to in Moor) states: "The Commission was but

the arm or alter ego of the State with no funds or ability to

respond in damages." 278 U.S. at 199.

54

dressed them in its analysis of what is a citizen and neither do

I. In any event, such interests can best be served by clear

rules for the generality of cases; every single piece of litiga-

tion need not require a return to first principles. Probably,

the major policy interest at stake lies in how the conclusion is

reached. Simplicity from the courts of appeals (and the Supreme

Court) on these gatekeeping and procedural issues will permit

lawyers and judges -- and most importantly, the parties -- to

deal with the merits of disputes in a simple and less costly

manner. Needlessly complex jurisdictional rules like those the

court advances here can only perplex the litigants as they pay

mounting attorney fees and suffer through procedural delays.

Congress has ordered district courts to pay heed to such concerns

in the Civil Justice Reform Act of 1990, 28 U.S.C. 471-482.

Appellate courts can make that task easier by resisting unneces-

sary subtleties and focusing instead on rules that ensure pre-

dictability and certainty, as well as fairness.

In all other respects, I join the court's opinion.

55